[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action in three counts instituted by the plaintiff Dominic Caciopoli (Caciopoli) against the defendant Peter Latella (Latella) seeking money damages, statutory interest and such other relief as may pertain in law or equity.[1]
The first count of the complaint sounds in conversion and the defendant Latella's answer denies every allegation of it. The first count alleges that on or about July 1, 1988, the plaintiff Caciopoli, Lawrence Minichino (Minichino), Robert Newkirk (Newkirk) and the defendant Latella formed a business entity known as Landfill Compaction Associates, Inc. (LCA), that before forming LCA all these persons agreed that "each individual" would share equally with the others the profits and losses of this entity" and "all parties agree initially that each individual would have a 20% share of the entity", that LCA operates a landfill in Wallingford, Connecticut pursuant to a contract with the Connecticut Resources Recovery Authority (CRRA) and that at all times since LCA began work pursuant to its contract LCA has generated profits, which profits are distributed monthly to its participants. It goes on to allege that "Caciopoli is entitled to 20% of these profits", that "at all times . . . Latella maintained complete control over the distribution of the profits of this entity" and that "for each and every distribution . . . Latella has converted to his own use at least one-half of the funds which should be distributed to Caciopoli."
The second count alleges an oral contract between Caciopoli and Latella. The first allegation, which is the only allegation CT Page 12008 of that count which is admitted, states that "on or about July 1, 1988, . . . Caciopoli and . . . Latella entered into an oral agreement whereby Caciopoli would contribute his help and legal counsel in a business venture with Latella to form an entity known as Landfill Compaction Associates Inc. (LCA) and to work towards securing a contract for that entity to operate a landfill." All the remaining allegations of the second count are denied. They are that in consideration of his efforts Caciopoli, was to receive a 20% share of LCA, that he fully performed this agreement with the result that LCA was awarded a contract to operate a landfill and does operate a landfill in Wallingford and that since LCA began operating this landfill and generating profits Latella has refused and/or neglected to pay Caciopoli 20% of the profits of LCA in breach of their agreement.
Turning to the third count, that seeks to recover interest on certain moneys that Caciopoli provided for the performance bond concerning the LCA contract on the Wallingford landfill. This count alleges that on or about July 1, 1988, Caciopoli, Latella, Newkirk and Minichino formed LCA, that at that time Caciopoli provided financing for bonding for LCA, that at all times thereafter LCA has been liable for interest earned on the funds provided by Caciopoli and that "Latella has diverted the profits of this entity and distributed said profits to himself and others without satisfying the debt due and owing to Caciopoli."
By way of broad overview the following circumstances are appropriately set out at this point. In July 1988, Caciopoli, Latella, Minichino and Newkirk participated in the formation of LCA intending, inter alia, to submit a bid with the CRRA which had solicited bids for the operation of a landfill in Wallingford. LCA did in fact submit a bid to CRRA on this project. The proportionate share of Caciopoli and Latella are seriously in issue in this case and are discussed below. In any event a bid bond in the amount of $25,000. was required to accompany the bid. Latella personally put up $25,000. of his own funds for the bid in lieu of a bid bond. LCA was the successful bidder. Having won the CRRA contract LCA was then required to post a performance bond in the amount of $125,000. Caciopoli, Latella, Minichino and Newkirk had agreed to endeavor to obtain a $125,000. letter of credit from an acceptable financial institution to file with CRRA to satisfy this $125,000. requirement. A time element was involved concerning the letter of credit. It appeared that it could not be obtained within the necessary time frame. Caciopoli, after discussing the matter with CT Page 12009 the other named individuals, agreed to advance and put up with CRRA $125,000 of his own personal funds in cash to satisfy the performance bond requirement of the CRRA in this matter. At that time Caciopoli entered into an agreement with the other three named participants that "we would replace my cash with a letter of credit, with all due speed, in all due speed I considered based upon [sic] discussions we had within a couple of weeks" and [Caciopoli] "based on that understanding did submit and place up $125,000 in cash." Caciopoli gave CRRA a cashier's check, dated August 26, 1988, and there is in evidence as Exhibit B a receipt from CRRA to LCA, dated August 26, 1988 for the $125,000. At the time he put up this $125,000 Caciopoli did not concern himself with interest on that money "because we were only talking a couple of weeks", nor did Caciopoli concern himself with getting any written documentation from the parties involved. Actually Caciopoli did not get his $125,000. back from the CRRA until November 28, 1990. We discuss below in detail the matter of Caciopoli's claim of interest due him on the $125,000.
On the night before LCA was to begin the actual operation of the Wallingford landfill a meeting was held at Minichino's office on Anderson Avenue in West Haven. This was in early September 1988, probably around the 5th or 6th of that month. Caciopoli, Minichino, and Newkirk were at that meeting as was Ronald Celentano, who apparently had known Latella for some period of time. Latella was not present as he was reportedly sick. Initially, at that meeting there was a "generalized discussion" about the opening next day of the landfill, about a walk-through with state and local officials as well as about preparing to operate it. In addition, at the end of the meeting Minichino handed out to those present "a sheet of paper . . . [and] that piece of paper indicated that there was a distributions of shares purported to say that this is what the ownership is going to be." This sheet, said Caciopoli, showed his share to be 10%, not 20% as he claimed he had always prior thereto understood from Latella that his share was to be i.e. 20%. With this Caciopoli said that he immediately asked Minichino to come into another room where they were alone. At that time Caciopoli said that he was "upset" and "infuriated" and wanted to know what was going on as he had always understood up to that time his share was to be 20% not 10%. Minichino, maintains Caciopoli, said at that time that he (Minichino) ". . . was just doing what Peter [Latella] told him to do." Caciopoli later went to see Latella about this and when that meeting with Latella took place is not at all clear with reference to how soon after the night he first learned that he CT Page 12010 was to receive 10%. In any event, he saw Latella alone. That meeting said Caciopoli was "a very short meeting" at which "I screamed, I yelled, I indicated how disturbed I was and he [Latella] just sat there and said that he wasn't going to change his mind anymore, that was it, he did it, and that's the way it is, that's the way it's going to be."
Over the period that LCA was operating the Wallingford landfill Caciopoli received "distributions" totaling $114,909.51 from LCA. According to the W-2 Wage and Tax Statements in evidence (Exhibits F, G and H) he received $77,604.00 for 1989, $27,704.71 for 1990 and $9,600.00 for 1991. These payments represented payments for a 10% share and not 20%. LCA operated as a business for approximately three and a half years until it then lost the bid to continue operating this landfill.
By January 1, 1991 Minichino and Newkirk no longer worked with LCA. By that time Latella's ownership had increased to 60%. He had bought Newkirk's interest outright when Minichino was still there. While Minichino was physically gone by January 1, 1991, and was living in Florida he still, according to Latella "was still a partner in the company." By January 1, 1991 it appears that Caciopoli, Latella and Celentano were the only ones left on the scene.
In addition to Caciopoli's claim that his share was to be 20% and not 10%, he also makes the argument specifically that as of January 1, 1991, Latella is personally liable to him in the amount of $30,031.25 in interest on the $125,000 he advanced in cash for the performance bond in 1988. This claim that Latella is personally liable on the interest claim is asserted on the basis of the "instrumentality rule" of such cases as Zaist v. Olson,154 Conn. 563 (1967) which we discuss below.
Here we believe that subsequent discussion will be illuminated by some observations on the background of those who testified in this case. They were four in number: Caciopoli, Latella, Newkirk and Jayne Harris.
Caciopoli is a practicing attorney and he has a number of businesses in which he is involved. His practice has "a very heavy emphasis in construction law and construction litigation." He is now involved in a medical equipment company and in the past in real estate development although he has not done very much in that area in the last few years. He has also been involved "in CT Page 12011 attempts to put together operations involving the environment and landfill." He had known Latella "over a course of a number of years". He said that in 1988 either Latella or Minichino, contacted Caciopoli concerning the possibility of working on a business which ultimately became the LCA landfill in Wallingford.
Latella's family has been in trash hauling and trash compaction business since 1919. The defendant Peter Latella has been involved in the business "since the middle 50s. He is `in partners with two refuse companies', one of which he owns with his father and his brother and the other which he owns `with a couple of other people.'" He was quite familiar with the operations of a landfill.
Robert Newkirk was a person whose basic activity was in the area of excavating and he was quite conversant with the machinery used for that. His area of operation in LCA was to maintain and service the operations of the machinery used in running a landfill such as bulldozers and compactors.
Ronald Celentano had known the defendant Latella for some years prior to 1988 and had worked for him prior to that date. Insofar as the LCA landfill in Wallingford was concerned he was the person who handled the day to day operations of it at the scene, he handled the scales which kept track of the amount of refuse brought into the landfill in trucks daily and the charges to be made. Celentano, according to Caciopoli, had "a very long standing relationship with Peter Latella."
Lawrence Minichino, at the time of the entity involved, i.e. LCA was conceived operated and was engaged in the real estate business with an office on Anderson Avenue in West Haven. For a time LCA operated out of that office until he left West Haven for Florida where he was at the time of trial. After he left West Haven and while LCA was still operating as a business, LCA moved its office to Peter Latella's place of business in Orange.
The witness Jayne Harris, who worked with the books of LCA keeping such things as accounts payable and account receivable, originally worked with Minichino in his real estate office but moved to Latella's office in Orange when Minichino left West Haven. However, from September 1988 "into 1992" she was employed by LCA basically as "the executive secretary" where she did payroll, accounts receivable, accounts payable and general office duties. There was evidence referring to her as the CT Page 12012 "Administrator" of LCA. While she did not make the decisions as to the issuance of LCA checks in payment of bills payable or distributions to those who had an interest in LCA including Caciopoli, Latella or Celentano, she did, when and as directed, issue such checks.
 I.
Caciopoli makes a number of claims. He maintains that he has proven a right to 20% of the distributions and not 10% as Latella contends. In that context he argues that Latella converted to himself 10% of the distributions to Caciopoli's harm. Because, maintains Caciopoli, Latella has so converted 10% of the distribution rightfully due to him, he (Caciopoli) is entitled to the value of the converted distributions plus interest thereon at 10% per annum. On this branch of the case Caciopoli claims, that as of August 1, 1995, there is due to him damages in the amount of $114,909.51 plus interest of $73,816.08 for a total of $188,725.59 to that date. He arrives at this result by using the amounts set out in his LCA "W-2 Wage and Tax Statements" in evidence as Exhibits F, G and H. There he argues that Latella converted $77,604.80 in 1989, $27,704.00 in 1990 and $9,600.00 in 1991 claiming that the total of three sums represents the 10% of the distributions to which he (Caciopoli) is entitled to make up 20%.
In his brief Caciopoli asserts that Latella's testimony on the issue of the percentage of the ownership in this enterprise was "neither consistent nor credible". He also maintains that Latella's testimony was "contradicted by all non-party witnesses." On the issue of his claimed right to 20% of the ownership, Caciopoli claims in his brief that he has demonstrated that this court should, under Secondino v. New Haven Gas Co.,147 Conn. 672 (1960) and the line of cases thereunder, draw an inference unfavorable to the defendant Latella for the latter's failure "to produce the one witness that logically could have supported his story, Lawrence Minichino". As to the second count of his complaint, Caciopoli maintains that the measure of damages there, if he is found to be so entitled, are contract damages, "which are identical to the damages claimed for Count One."
As to the "corporate debt" of LCA to Caciopoli, he claims that the interest on the $125,000. loaned to LCA by Caciopoli alleged to be due him there is due from Latella individually. That is so, he says, because the evidence is such as to permit CT Page 12013 the piercing of the corporate veil to impose individual liability on Latella pursuant to the "instrumentality rule" of such cases as Zaist v. Olson, 154 Conn. 563 (1967). This claim maintains that Latella's control of LCA was such that he used it to harm Caciopoli by the breach of his duty to the plaintiff in the repayment of that interest debt, at a time when LCA had the money to do so and should have done so. Caciopoli's claim here is that the interest debt has existed since June 1, 1991 when it was $23,278.12 which with interest on it at 10% per annum since that date to August 1, 1995 of $11,371.39 how totals $34,649.51. On the claim of the control of LCA by Latella under the "instrumentally rule" Caciopoli also claims that he has demonstrated that this court should draw, under Secondino v. NewHaven Gas Co., supra, an inference unfavorable to Latella "concerning the failure of the defendant to call Ronald Celentano to the stand." In addition, as to the "control" of Latella under his "instrumentality rule", Caciopoli argues that in determining the question of harm to him that this court should also draw an inference "that all of the payables, in fact, were paid."
On the other hand, the defendant Latella advances contrary claims. He maintains that no additional distributions are due Caciopoli. There, he contends that all the corporate distributions made were done in accordance with the agreed ownership percentages. As concerns Caciopoli, Latella claims that the only offer made to Caciopoli and the one which Caciopoli accepted was one for Caciopoli to get a 10% share in LCA distributions. Latella claims that Caciopoli has not proven his claim of an agreement to receive 20% of such distributions, arguing that the testimonial and documentary evidence demonstrates Caciopoli's right to 10% and not 20%.
Latella also maintains that to permit Caciopoli, an attorney, to recover on his claim that an oral agreement existed for 20% of the corporate distributions, where none of these claimed terms of Caciopoli's 20% interest in this business venture were ever transmitted in writing to either Latella or LCA would contravene the provisions of Rule 1.8a(1) of the Rules of Professional Conduct to which attorneys are held. Further, in referring to Caciopoli's "attempting" under the second count to enforce the claimed oral agreement with the defendant, Latella argues that Caciopoli ". . . is an experienced attorney who it can be presumed had the good sense to document in writing the terms of such an agreement for the formation of a business." He argues that "the Rules of Professional conduct impose an obligation upon CT Page 12014 the attorney to make such a writing" and "had the business plan for Landfill Composition Associates been documented from the outset, this dispute would never have arisen."
Insofar as Caciopoli depends upon Secondino v. New Haven GasCo., supra in asking that this court draw an inference unfavorable to the defendant because of his alleged failure to produce Lawrence Minichino as a witness there Latella argues there that Caciopoli has not sustained his burden of showing that he is entitled to such an inference because Caciopoli has not demonstrated that Minichino is "available". Latella rejects Caciopoli's claim in the third count that he is personally liable to him for his claim of interest where the plaintiff urges the piercing of the corporate veil under the "instrumentality rule" of Zaist v. Olson, supra. There Latella contends that under the evidence and the law that the "instrumentality rule" cannot be invoked in this case and that the interest debt on the Caciopoli loan is not his individual debt but was and is that of LCA.
In his reply brief Caciopoli responds to Latella's claim on Rule 1.8 of the Rules of Professional Conduct by urging that it is inapplicable. In doing so, he maintains that if his scenario is accepted then clearly he did not enter into a "business transaction with a client" (See Rule 1.8(a)(1) Rules of Professional Conduct"), and that there was no evidence that he had an attorney-client relationship with Newkirk, Minichino or Latella. He merely, he continues, became a business partner with these persons "in a specific business transaction" in which he obtained a property interest which Latella converted and that he never had any attorney-client relationship with them. Therefore, he concludes that the cited Rule has no application here and cannot be invoked by Latella to "unravel the deal" made with him. Alternatively, Caciopoli contends that if Latella's version of events is accepted, i.e. "that Mr. Caciopoli was hired to provide legal services for a 10% share in the business, then again, this court need not consider Rule 1.8." There he reasons that if Latella's version, is accepted, then both parties agree that Caciopoli has already received 10% of the business distributions and so, in that event, he says this court simply finds for Latella without invoking Rule 1.8.
 II.
At this point it is appropriate to point out that credibility is focal in passing upon issues involved in this case as there CT Page 12015 were serious conflicts in the testimony. Several relevant principles are, therefore, properly referred to here. It is well-established that in a trial to the court the trial judge is the sole arbiter of the credibility of the witnesses. "It is the trier of fact which determines the credibility of witnesses and the weight to be accorded their testimony." In re Robert H.,199 Conn. 693, 712 (1986) quoting from State v. Carter, 196 Conn. 36,45 (1985). Where the evidence is in conflict, its probative force is for the trier of fact to be determine. Bowman v. 1477 CentralAvenue Apartment Inc., 203 Conn. 246, 257 (1987); KowalskyProperties, Inc. v. Sherwin-Williams Co., 7 Conn. App. 136, 140
(1986). The trier of fact may reject testimony even if it is uncontradicted and is equally free to reject part of the testimony of a witness even if other parts have been found credible. Barrila v. Blake, 190 Conn. 631, 639 (1983); Griffin v.Nationwide Moving Storage Co., 187 Conn. 405, 422 (1982). "Testimony that goes uncontradicted does not thereby become admitted or undisputed . . .; nor does the strength or a witness' belief raise it to that level." Stanton v. Grigley, 177 Conn. 558,563 (1979); see Acheson v. White, 195 Conn. 211, 217 (1985). Not only may the trier of fact consider the interest of any witness in determining credibility, Buonanno v. Cameron,131 Conn. 513, 545 (1945) but it has also been stated that "It is the peculiar province of the trial court to observe the demeanor of the parties and their witnesses and to draw inferences therefrom as to the motives underlying their testimony and their conduct. Findings based upon these observations in the courtroom are in the same category as findings based upon a view of premises or property. Such evidence is was properly to be considered by the court in rendering its decision or making its finding as if presented by the lips of witnesses." Dadio v. Dadio, 123 Conn. 88,93, (1937); See Augur v. Augur, 133 Conn. 211, 213-214
(1948).
 III.
We turn now to Caciopoli's claim that Latella converted one-half of the distributions due him based on Caciopoli's position that he was entitled to 20% of the distributions. "Conversion occurs when one, without authorization, assumes and exercises the right of ownership over property belonging to another, to the exclusion of the owner's rights." Falker v. Samperi, 190 Conn. 412,419. . . . The essence of the wrong is that the property rights of the plaintiff have been dealt with in a manner adverse to his rights and to his harm. Falker v. Samperi, supra 419-420, CT Page 12016Devitt v. Munlik, 176 Conn. 657, 662-663 (1979); Coleman v.Francis, 102 Conn. 612, 615 (1925); Epstein v. AutomaticEnterprises, 6 Conn. App. 488, (1986). Whether evidence is sufficient to prove conversion presents a question of fact. Omarv. Mezvinsky, 13 Conn. App. 533, 536 (1988), cert. denied208 Conn. 803 (1988). "Money can clearly be subject to conversion."Omar v. Mezvinsky, 13 Conn. App. 533, 536 (1988); cert. denied208 Conn. 803 (1988) see Aetna Life Casualty Co. v. Union TrustCo., 230 Conn. 779, 790 m.6 (1994).
Before, however, we can reach the issue of conversion we must decide to what percentage of the distributions the plaintiff Caciopoli was entitled to receive. Was it the 20% that he claimed to be entitled to? Was it the 10% that he received? If it proves to be the former we reach the issue of conversion. If it is the latter, we do not reach that issue. We conclude as we set out below that the plaintiff Caciopoli has not sustained his burden of proving that he was entitled to receive 20% of the corporate distributions.
The idea of getting a group of persons together to embark on a business enterprise to operate the Wallingford landfill involved in this case was Latella's. It occurred to him when he read a newspaper advertisement that the CRRA was soliciting bids to operate that landfill. While much is claimed as to who contacted who in this matter at the outset as between Caciopoli, Latella and Minichino, we determine that Latella did contact Minichino and indicated his interest in such a group enterprise. He also informed Minichino that he (Latella) would take a forty percent share. As to which one, Latella or Minichino, first contacted Caciopoli, the evidence is conflicting. Caciopoli, on direct examination, as to which one first contacted him said "I'm not sure today whether that was Peter Latella or Larry Minichino." He never changed that testimony. In any event as to what was mentioned "in the first contact" with Caciopoli, he said it was "that myself, Peter, Larry Minichino and Bob Newkirk were coming together to put together a bid as there was a request for a proposal to operate the Wallingford Landfill and that if I had an interest we should get together and see and what those opportunity would be." Latella did call Caciopoli to come in and be a partner "with us" and Latella told Caciopoli that he would be getting a 10% interest for "for being the attorney for the corporation." Latella brought Caciopoli "in as a friend to give him part of the business, okay and to be the attorney as a friend." CT Page 12017
There was no corporation initially. One, i.e. LCA was formed and was awarded the contract to operate the Wallingford landfill Latella had previously incorporated a business in the past and had hired an attorney to do so. He had retained an attorney to do so "a couple of times." Latella also expected that there would be some legal work to do after this corporation was formed. There was no such evidence of such work in this case. There were meetings in the beginning at which Caciopoli, Latella, Minichino and Newkirk were present. In any event, the corporation known as LCA was formed by Caciopoli. He, however, did other work concerning this enterprise as prior to the opening of the landfill in September 1988 he worked on the bid documents, reviewed specifications, analyzed the contract and attempted to obtain a performance bond and the like.
It is the plaintiff's position, as he testified, that "we were all going to be equal in our interests. [Caciopoli, Latella, Minichino and Newkirk] were all going to have 20% each and that 20% additional was going to be divided . . ." in a fashion that he described.[2]
To support the claim that his share of the distributions to the owners of this enterprise was to be 20% and not 10%, the plaintiff also produced, as a witness Newkirk, an original participant in this enterprise. Some time later Newkirk sold his share in LCA to Latella. A crucial claim for Newkirk's evidence is that at all times after he (Newkirk) was asked to participate in this venture, Mr. Caciopoli, Mr. Newkirk, Mr. Minichino and Mr. Latella were to have equal shares of the business, that was 20% each. Neither Newkirk nor the plaintiff ever effectively addressed Latella's having more than 20% almost from the outset, (see Exhibit A), especially when claiming all were to be equal partners. Newkirk testified that the discussions concerning equal 20% shares took place at meetings in which Mr. Latella participated. He stated unequivocally that there were no discussions that Mr. Caciopoli would receive less than 20%. Mr. Newkirk believed at all times that Mr. Caciopoli was supposed to receive the same percentage of the business, as he, Mr. Newkirk did. He testified that the first time that he ever heard that Mr. Caciopoli was going to receive a smaller share was at a meeting held the night before the group was to begin work pursuant to their contract with the CRRA.
As a witness Newkirk's testimony was significantly shrouded CT Page 12018 in uncertainty. He was not a persuasive witness. Newkirk, significantly, never discussed with Latella or anyone involved in LCA, except Caciopoli, the circumstance that Caciopoli's interest in LCA was shown as 10%. He had signed an affidavit he said on January 16, 1991, after he had left the LCA business, which as this court observed he consulted, as he testified maintaining that apart from that he had no independent recollection of important events and times. He did, however, remember "independently" that Latella called him about coming into the enterprise but he could not remember even approximately when that was including who was at the first meeting of the group. After consulting the affidavit he did "recall" that he, Caciopoli, Latella and Minichino were there. Again upon consulting the affidavit, he said that it helped him to remember that the "initial discussions" as to what the shares of ownership were going to be; i.e. that the four names on that paper were supposed to have equal shares of 20%. Newkirk's so-recollection upon reading his "affidavit" was, in this court's observation and opinion, no more than his purported reading of what was said to be in it. This contributed to the unreliability of his testimony.
He also believed that proportionate ownership was discussed from the time the respective shares of ownership were discussed and that he, Caciopoli, Latella and Minichino were "going to have equal amounts" and that the remaining 20% was going to be split up "with whoever." He contended that he believed this until he was given his copy of Exhibit A by Minichino at the meeting the night before the landfill opened. Actually, Newkirk is the one who brought to court Exhibit A. This exhibit entitled "Stock Distribution", which was typewritten on plain white paper and shows under "Stock Distribution" only the following:
"Dominic Caciopoli 100 shares
Ronald Celentano 100 shares
Peter Latella 400 shares
Lawrence C. Minichino 200 shares
 Robert E. Newkirk 200 shares ____ ____
Total Shares issued 1,000 shares" CT Page 12019
Some things bear noting here. Upon receiving his copy of Exhibit A, Newkirk thought that that was unusual as he had been involved with other corporations and there usually stock certificates were given out. Actually, Newkirk never got any stock certificates showing his share interest in this corporation and there is no evidence that anyone involved in LCA, including the plaintiff were ever issued stock certificates.
Caciopoli said that on that night before the opening day that, at the end of the meeting just referred to "we were handed a sheet of paper . . . by Larry Minichino, that piece of paper indicated that there was a distributions of shares purported to say that this what the ownership is going to be." At the trial Caciopoli said he did remember getting a document from Minichino demonstrating that "was getting 10% instead of 20%" and that "that document indicated I was getting an interest, that was different than I was supposed to get." He did not produce at trial the document he said that he received at that time. No stock certificate evidencing any shareholder's interest in the corporate entity involved, i.e. LCA was ever offered in evidence or even referred to as having been issued.[3] This is only one example of the corporate "informality" on the part of the owners of LCA. There are others including no stock transfer book, no corporate minutes of any sort, no corporate resolutions, no indication of who were ever corporate officers or directors.
There is, however, some "documentation" of LCA which with other evidence referred to support our conclusion that Caciopoli has not sustained his burden of proof, as he claims, that he was entitled to 20% of the distributions and not the 10% he has already received. Exhibit A, which came in through Newkirk and was distributed the night before the landfill operation began showed Caciopoli's "stock distribution" to be "100 shares." Defendant's Exhibit 2 was a Xerox copy of an Internal Revenue Service Form entitled "Election by a Small Business Corporation" which, when consented to and signed by all the stockholders of such a corporation affords certain tax advantages to shareholders. See 26 U.S. Code (Internal Revenue Code) § 1361 et seq. (S. Corporation).[4] LCA did apply for treatment as an S corporation in October 1988. Caciopoli, Celentano, Latella, Minichino and Newkirk are listed on this form as the shareholders of LCA. Each of these five are listed on five separate lines. As to each one his name is printed, then immediately to the right of that is his purported personal handwritten signature and to the right again of that is the "number of shares" of stock CT Page 12020 represented to be owned and the date of acquisition of each shareholder's shares which in each case is set out as July 30, 1988. The "number of shares" of "Stock Owned" column discloses the following: Dominic Caciopoli — 100, Ronald Celentano, Sr. — 100, Peter Latella 400; Lawrence Minichino — 200, and Robert Newkirk — 200 for a total of 1000 shares. Caciopoli admits that he did sign this subchapter Selection S form but only after refusing to do so for a time. He said that he only did sign because the time to make such an election for subchapter S treatment was running out. He admittedly, as did all the other signatories, want Subchapter S tax treatment. He claims, however, that he did not sign it as "saying that the shares that they put there were an accurate representation of my ownership in the company, nor did I see this document and this election of the Sub Chapter S. Corporation as the proper form [sic] for resolving a stock dispute." In the view of this court, it is nevertheless evidence that clearly does not support his 20% entitlement claim. Moreover, it is to be kept in mind that even he admits that he did not express in writing to anyone his dissatisfaction with the allocation of 10% of the shares on the S. Corporation Election form. Actually, there is no evidence that Caciopoli ever expressed his dissatisfaction in writing to anyone in this case about the share allocation of 10% to him even apart from the Subchapter S form. That is not to say that he does not maintain that he did not do so orally to Minichino and Latella. He "believed" that he did so to Jane Harris, but he said he was not "positive" about that. Harris' testimony was that, to the best of her memory Caciopoli first complained to her "about the percentage" was after Minichino left for Florida. That was January 1991. She also said that there was a time during which LCA was operating that there was no complaint at all about the amount received by Caciopoli and she was the one who was sending out the distribution checks. In addition, the copies of the LCA payroll ledger sheets in evidence consistently show Caciopoli receiving 10% of the distributions over the time period LCA was operating the Wallingford landfill. There was some evidence that on occasion that by way of protesting the 10% allocation, he did not cash certain of the distribution checks to him from LCA embodying the 10% allocation for some period of time. As to when or how often this may have occurred there is no evidence. All of his distribution checks were eventually cashed by the plaintiff. In that regard we note that there was at the trial in the courtroom, several cardboard boxes said to contain the LCA records. No cancelled checks of LCA to the plaintiff were offered to indicate how long any one or more of them were held before CT Page 12021 cashing.[5]
We now turn to Latella's claim under § 1.8[6] of the Code of Professional Conduct against Caciopoli. "Whether an attorney-client relationship exists is an issue for the trier of fact, and the party claiming its existence bears the burden of establishing such a relationship. " Danhan v. Danhan, 204 Conn. 303,320 (1987) and authorities there cited. There is no credible evidence from which we can conclude that Latella has sustained his burden of establishing the existence of an attorney-client relationship between Caciopoli and himself. In addition, we cannot find proven any attorney-client relationship between Caciopoli and Newkirk, between Caciopoli and Minichino or between Caciopoli and Celentano, we reject Latella's claim that Rule 1.8 of the Code of Professional Conduct is applicable.
Going on, Caciopoli argues that this court should draw, as to Minichino, a Secondino inference unfavorable to Latella. Minichino is "the one witness" Caciopoli argues, "that logically could have supported his [Latella's] story." He claims that "this inference should be made with regard to the defendant's failure to call Lawrence Minichino or to preserve his testimony in any way for this court." Contending that evidence that would have been given by Minichino would have been unfavorable to Mr. Latella, Caciopoli argues that Latella's counsel said at the trial that he believed that the defense could produce Minichino as a witness, that he would be able to produce testimony from Minichino, that he knew where Minichino was, that he [Latella's counsel] had "been in recent contact with him [Minichino] to the point of obtaining an affidavit from Mr. Minichino."[7]
Latella, in arguing against the claimed unfavorable Secondino
inference sought against Minichino, contends that under Secondino
the party seeking the benefit of such an inference has the burden of establishing the two factors required by that case in order to permit such an inference. He argues that Caciopoli has not sustained his burden of showing the "availability" of Minichino as required by Secondino. In addition, he contends that pages of the transcript that are cited for the plaintiff's claim that defendant's counsel "confirmed a number of times that the Defendant would be able to produce testimony from Mr. Minichino" are "a mischaracterization of the statements that were made".
"There are two requirements for the application of the rule referred to as the Secondino rule: the witness must be available, CT Page 12022 and he must be a witness whom the party would naturally produce.Secondino v. New Haven Gas Co., 147 Conn. 672, 675, 165 A.2d 598
(1960). "A witness who would naturally be produced . . . is one who is known to that party and who, by reason of his relationship to that party or to the issues, or both, could reasonably be expected to have peculiar or superior information material to the case which, if favorable, the party would produce." Nichols v.Coppola Motors, Inc., 178 Conn. 335, 343, 422 A.2d 260 (1979), quoting Secondino v. New Haven Gas Co., supra. The burden of showing the availability of the witness, however, is on the party seeking the benefit of the inference. Nichols v. Coppola Motors,Inc., supra, 342," New England Whalers Hockey Club v. Nair,1 Conn. App. 680, 685 (1984); Shelnitz v. Greenburg, 200 Conn. 58,73 (1986). Although whether a particular witness is "available" is one of two distinct requirements for the operation of theSecondino rule, "there is little question that availability is relative to the naturalness of production requirement. Shelnitzv. Greenburg, supra 74." In Shelnitz our Supreme Court said in that context "The notion of the power and the ability to procure the witness by process or otherwise, is critical to availability. Before a negative inference can be drawn from a party's failure to produce a particular witness, it must be shown that the party was able to procure the witness' physical presence in court."Shelnitz v. Greenburg, supra 74, 75 (underlining added); State v.Briggs, 17 Conn. App. 648 (1989).
The plaintiff's references to statements of defense counsel as to the availability of Minichino under Secondino do not avail him. The court has examined the trial transcript on this issue, including those portions cited in the post trial briefs as well as those not cited on this claim. They are conflicting. In claiming the inference the plaintiff makes much of certain statements of defense counsel as to his ability to produce Minichino here in court as a witness. "It is well settled that representations of counsel are not, legally speaking `evidence'".Cologne v. Westfarms Associates, 197 Conn. 141, 154 (1985)." Fairly stated, evidence legally is the means by which alleged matters of fact are properly submitted to the trier of fact for the purpose of proving a fact in issue. On the other hand, "proof" is the result or the effect of such "evidence". Moreover, these representations were not "testimony," which, in turn, when given under oath or stipulated to, is a species of "evidence."Cologne v. Westfarms Associates, supra. 154. Such statements of counsel cannot therefore be considered "evidence" to support "proof" that the plaintiff has sustained his burden of proof to CT Page 12023 entitle him to the requested Secondino inference. Parenthetically, on the second day of trial, which was after a week-end recess, defendant's counsel stated, as he had earlier that he knew how to contact Minichino in Florida (where he has apparently been for some time), and counsel said "He [Minichino] was not able to come to Connecticut. He [Minichino] refused to do so." Even if the unsworn assertions of either counsel could be considered "evidence" that could properly be considered on whether the plaintiff sustained his burden of proving entitlement to the claimed inference, the fair assessment of them, given the conflicting characterizations weigh strongly on the defendant's side. Insofar as only "evidence" is concerned to find that the plaintiff has sustained his burden of proof of demonstrating that Minichino is "available" that must be resolved against the plaintiff's claim here. The court, therefore, will draw noSecondino inference as to Minichino unfavorable to the defendant as requested.[8]
The plaintiff Caciopoli has not sustained his burden of proof on the allegations on the first and second counts of the complaint. He is therefore not entitled to 20% of the corporate distributions as he claimed, but only 10% which latter percentage he has already received. Accordingly, judgment is entered for the defendant Latella as the first and second counts of the complaint.
 IV.
We turn to the third count of the complaint under which the plaintiff Caciopoli seeks to recover from the defendant Latella the interest (plus interest on the interest debt) remaining unpaid on the $125,000 loan he made in 1988 to LCA. We will not repeat all the claims set out earlier above as to this claim. It is true that Caciopoli in invoking the "instrumentality rule" of such cases as Zaist v. Olson, 154 Conn. 563, is asking this court to pierce the corporate veil of LCA so as to render Latella personally liable.[9] The defendant's position is that the recovery sought here has been and remains the corporate debt of LCA. In any event, the defendant also argues that Caciopoli, on the evidence and the law, has not proven that the "instrumentality rule" is applicable in this case.
"`Courts will . . . disregard the fiction of a separate legal entity to pierce the shield of immunity afforded by the corporate structure in a situation in which the corporate entity has been CT Page 12024 so controlled and dominated that justice requires liability to be imposed on the real actor.'" [citations omitted]. Angelo TomassoInc. v. Armour Construction Paving Inc., 187 Conn. 544, 553
(1982); Saphir v. Newstadt, 177 Conn. 191, 209 (1979). The piercing of the corporate veil to impose personal liability "is equitable in nature". Falcone v. Night Watchman, Inc., 11 Conn. App. 218,220 (1987). "No hard and fast rule, however, as to the conditions under which the entity may be disregarded can be stated as they vary according to the circumstances of each case."Angelo Tomasso, Inc. v. Armor Construction Paving, Inc., supra, 555-556. Each case is basically sui generis and to be decided in accordance with its own underlying facts. Falcone v. NightWatchman, Inc., supra 223. The burden of proving that the corporate veil should be pierced is on the plaintiff. Season-AllIndustries Inc. v. R.J. Gross, Inc., 213 Conn. 486, 492 (1990). "A key factor in making a determination of whether the corporate shield should be disregarded is the degree of control or influence exercised over the corporation by the individual sought to be held liable. Christian Bros., Inc. v. South Windsor Arena,Inc., 7 Conn. App. 648, 651, 509 A.2d 1095 (1986)." Falcone v.Night Watchman, Inc., supra 221. "The circumstance that control is exercised merely through dominating stock ownership, of course, is not enough." Zaist v. Olson, supra 574. As Zaist also points "There must be `such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal.'" Id. p. 574. The fact, however, that the corporate veil [may] be disregarded for some purposes does not mean that it must be disregarded for all purposes." AngeloTomasso, Inc. v. Armor construction Paving, Inc., supra, 559. The "instrumentality rule" accommodates this in its control element when it refers to control ". . . in respect to the transaction attacked", see e.g. Zaist v. Olson, supra 573 and here we are concerned with the circumstances surrounding the payment of interest on the $125,000 loan by Caciopoli.
Zaist states that "The instrumentality rule requires, in any case but an express agency, proof of three elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other CT Page 12025 positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of. [citations omitted]." Zaistv. Olson, supra, 575 (underlining added);[10] Saphir v.Newstadt, supra 210.
Caciopoli did loan LCA the $125,000 for the performance bond in August 1988. He did not ask that he be paid interest on that loan at that time because it was believed that this cash payment to the CRRA would be replaced after a couple of weeks with the letter of credit in that amount to be deposited with the CRRA. When it became apparent that that was not to occur, Caciopoli said that he wanted to be paid interest on that sum. That was agreed to. Caciopoli received the $125,000 deposit from the CRRA on November 28, 1990. As already indicated, corporate distributions from LCA were made during 1989, 1990 and 1991. LCA continued operating until some time in 1991. In any event, on January 21, 1991, LCA, on a letter on LCA stationery (Exhibit P) to Caciopoli, signed by the witness, Jayne Harris as "Administrator" stated $26,250.00 was the interest balance due to him on his $125,000 loan. It explained that the loan "was set up at a rate of 10% per annum not compounded monthly" and it referred to the "term of the note."[11] This LCA letter stated that $12,500.00 in interest was due for the year 1989 and $13,750.00 for the year 1990 for the total of $26,250.00. At about the same time, LCA in a letter on LCA stationery, dated January 30, 1991 (Exhibit 7) to Latella, signed by the witness, Jayne Harris as "Administrator" stated that $6,000.00 was the interest balance due to him on his $25,000. loan to LCA.[12] It explained that the $6,000.24 consisted of $2,500.00 "1 year 1989 10%" for $2,750.00 "2 Year 1990 10%" and "3 months Dec. `90 $756.24" for an interest balance due Latella of $6,000.24.
In this time frame it also must be noted that Newkirk was no longer an owner of any interest in LCA as Latella had bought out his interest making Latella's share at least 60%. Moreover, at this time, it also appears that Minichino had left Connecticut for Florida and was no longer actively engaged in LCA.[13] Once Minichino went to Florida, matters concerning the business were moved from Minichino's real estate office in West Haven to Latella's place of business in Orange, at which Jayne Harris continued to work for a time. This left Caciopoli, Latella and Celentano on the scene. CT Page 12026
No interest was in fact paid until 1991 on either Caciopoli's $125,000 loan or Latella's $25,000 loan and, as can be seen, Caciopoli would be entitled to five times the interest due Latella. There is no question but that the evidence shows the interest on Caciopoli's loan was an "account payable". Harris' evidence indicated that it was her practice to sent out monthly to the interested parties a statement of the payables and the percentage distributions. There was not really any communication with Anna Minichino, but Harris "would send her correspondence on what the payables were and look for a consensus, or they would have a meeting. I would be directed." The evidence concerning any claim of a "meeting" in the context of discussing what and how to pay Caciopoli's interest claims is unreliable. Caciopoli, however sought repayment of the entire interest amount and he spoke to Harris and Latella about that. It is clear that Harris did not decide who received what or how much or when payment was to be made of moneys[14] disbursed. When Caciopoli asked that the entire interest payment be reimbursed to him, Latella told him that "he [Latella] was going to write out what he going to write out and that's it." As to what portion of Caciopoli's interest to pay Harris would "look to Peter [Latella]". Even assuming that as Latella testified Harris and Celentano "went over the bills, what to be paid", Celentano's input decision wise is not at all clear. Certainly, there is no evidence that Celentano had any role in deciding how Caciopoli's interest was to be paid. It is, however, clear that Latella, was totally in control here. The interest owing on Caciopoli's loan was a proper account payable and should have been paid in 1991 as there was money to do so. Latella, on the interest payments, told Harris not to pay Caciopoli "any more percentage that she would pay me. If she gave him [Caciopoli] 10% of his total figure, give me 10% of my figure." Of course, 10% of what Caciopoli was owed on interest on his loan of $125,000 would vary greatly from 10% of what Latella was owed on his loan of $25,000.
In further disputing the plaintiff's claim that he personally and not LCA is liable on the interest issue, Latella also argues that there were other bills incurred while LCA was operating that had to be paid in 1991 and were paid. There it seems that he says that eventually there was no money to pay Caciopoli's interest claim. With reference to bills that Latella maintained had to be repaid and were paid LCA's was "part" in a $70,000 bank to on repayment to CN Bank.[15] In addition, he said there were "fill" bills "for covering the landfill and capping off the landfill", bills for "materials" and a bill for "seeding". There CT Page 12027 is no documentary evidence such as cancelled checks, invoices, corporate records, etc. for any of these claims. None of these "bills" have been proven to be proper accounts payable. However, from the time of the first interest payments to Caciopoli as well as Latella in January 1991 and during that year there corporate distributions were made to both Caciopoli, Latella, and others, according to the "Payroll ledger" sheets in evidence. In 1991 Latella was paid $57,600 and Caciopoli was paid $9,600. and this reflected a 60% ownership in Latella and one of 10% in Caciopoli. The latter percentage we have already determined was the percentage of Caciopoli's ownership. The point to be made, however, is that there more than enough money distributed as profits to pay the total amount of the interest due Caciopoli which as of June 1, 1991 was $23,327.81. There were total corporate distributions of $96,000 in 1991. The fact that Latella's receipts in 1991 by way of corporate distributions reflect the ownership percantage allocable to him does not change the circumstances that Caciopoli's interest payment was a legitimate payable that was outstanding, that any of the corporate bills that Latella maintained had to be paid have not been so demonstrated and that there was sufficient moneys to pay the Caciopoli claims. It was not paid, and it was because Latella was in control in this matter.
The burden of proof on the three elements of the instrumentality rule of Zaist v. Olson, supra has been sustained by the plaintiff on this matter. Latella individually, and not LCA, completely dominated on the matter of the payment of the interest on the Caciopoli loan from the time interest was paid on it. That control was exercised in an unjust manner. Caciopoli was entitled to have all the interest due him paid in 1991 and there was more than sufficient money available to have done that. This wrong and unjust loss complained of, i.e. the failure to pay the total interest due him in 1991 was proximately caused by the Latella's conduct as set out above. Caciopoli is found entitled to recover on this branch of the case under the third count.
As of June 1, 1991 Caciopoli was owed $23,278.12 in interest on his $125,000 loan. In addition to that amount he is requesting interest on that amount, pursuant to General Statutes §37-3a[16] claiming that the interest monies due him were wrongfully detained by Latella through his domination of LCA.
"The allowance of prejudgment interest under § 37-3a is a matter within the discretion of the trial court. Metcalfe v.CT Page 12028Talarski, 213 Conn. 145, 160, 567 A.2d 1148 (1989); Solomon v.Hall-Brooke Foundation, Inc., 30 Conn. App. 136, 146-47,619 A.2d 866 (1993); Alderman v. RPM of New Haven, Inc., 20 Conn. App. 566,569-70, 568 A.2d 1068 (1990). This allowance turns on `whether the detention of the money is or is not wrongful under the circumstances.' (Internal quotations marks omitted.) Lawrencev. New Hampshire Ins. Co., 29 Conn. App. 484, 498 616 A.2d 806
cert. denied, 224 Conn. 293, 618 A.2d 528 (1992); Solomon v.Hall-Brooke Foundation, Inc., supra, 146. If the trial court determines that one party has wrongfully detained funds, it must next determine the date the wrongful detention began. . . ."Patron v. Konver, 35 Conn. App. 504, 517 (1994), cert. denied231 Conn. 929 (1995). The moneys due Caciopoli by way of interest was wrongful under the circumstances. The date the wrongful detention began was June 1, 1991 and Caciopoli claims the § 37-3a
interest from that date.
As to his claim for interest under General Statutes § 37-3a
the plaintiff Caciopoli is awarded § 37-3a interest in the amount of $11,929.80.
 V.
On the third count the plaintiff Caciopoli is, therefore, awarded the sum of $23,278.12 plus § 31-3a interest on that sum to August 1, 1995 in the amount of $11,362.20 for a total of $34,640.32 plus $9.46 interest per diem after August 1, 1995. On the first and second counts the issues are found for the defendant Latella and judgment thereon is so entered.
Arthur H. Healey State Trial Referee