JOHN ZAIST ET AL. *v.* MARTIN OLSON ET AL.

KING, C. J., ALCORN, HOUSE, COTTER and RYAN, Js.

Argued December 13, 1966—decided March 7, 1967

*Howard F. Zoarski,* for the appellants (defendants).

*Richard F. Corkey,* with whom was *Robert B. Hempstead,* for the appellees (plaintiffs).

ALCORN, J.   The plaintiffs brought this action against Martin Olson, The East Haven Homes, Inc., and Martin Olson, Inc.  The allegations of the complaint, briefly stated, are that the plaintiffs rendered services, supplied materials and furnished equipment to The East Haven Homes, Inc., for work on properties owned or leased by Martin Olson and Martin Olson, Inc., or by corporations subsequently merged into the latter; that the services, material and equipment were furnished at the instance and request of Martin Olson, who was an officer and director and the person in general charge of the affairs of The East Haven Homes, Inc.; that this corporation acted as the agent or instrumentality of Martin Olson and of Martin Olson, Inc., of which Martin Olson was also an officer and director and the person in general charge; that the services rendered and the material and equipment furnished inured to the benefit of Martin Olson and Martin Olson, Inc.; and that the plaintiffs were entitled to recover the amount due with interest.

The defendants' answer was a general denial, and, on stipulation of the parties, the court referred the case to a referee to hear the facts and to report. The referee filed his report, recommending a judgment in favor of the plaintiffs against Martin Olson and Martin Olson, Inc.   The defendants made a

massive attack on the report by a motion to correct, in response to which the referee made a limited number of corrections, whereupon the defendants filed with the court, and were heard on, exceptions to the report as corrected and a request for further corrections by the court. The court overruled the exceptions, refused to make the corrections sought, and rendered judgment on the referee's report. This appeal is from that judgment.

The judgment is that the plaintiffs recover of Martin Olson and Martin Olson, Inc., a total of $31,596.95, which includes interest to the date of judgment. It fails to dispose of the issues between the plaintiffs and The East Haven Homes, Inc. All three defendants have appealed, however. The record in the case is, therefore, incomplete because of the failure of the judgment file to record any action by the court concerning The East Haven Homes, Inc. *Harris* v. *First National Bank & Trust Co.*, 139 Conn. 749, 751, 97 A.2d 260. There is, in fact, no judgment from which that defendant may appeal. While this defect has obviously escaped the attention of the parties, the case stands before us as an appeal by the defendants Martin Olson and Martin Olson, Inc.

The memorandum of decision makes clear that recovery was allowed to the plaintiffs against only Martin Olson and Martin Olson, Inc. It was apparently through an oversight that no disposition as to the other defendant was ordered. *Pepin* v. *Ryan,* 133 Conn. 12, 17, 47 A.2d 846. The judgment file was signed by the clerk; Rractice Book § 270; and correctly followed the mandate of the memorandum of decision. Thus, it is properly subject to correction only if we first set it aside. *Lerner Shops of Connecticut, Inc.* v. *Waterbury,* 151 Conn.

79, 94, 193 A.2d 472. Regardless of the decision on the other issues involved, the judgment must be set aside and the case remanded so that the judgment may be corrected to dispose of the issues between the plaintiffs and The East Haven Homes, Inc. *Machiz* v. *Homer Harmon, Inc.,* 146 Conn. 523, 526, 152 A.2d 629; see *Wexler Construction Co.* v. *Housing Authority,* 149 Conn. 602, 607 n., 183 A.2d 262.

We turn now to the appeal by the defendants Martin Olson and Martin Olson, Inc., which, in actuality, is the only appeal briefed and argued before us. These defendants once again attack, in wholesale fashion, the referee's finding of the facts upon which the judgment was rendered. A study of the evidence submitted in the appendices to the briefs satisfies us that no corrections in the referee's amended report are merited and that the court did not err in overruling the exceptions and objections to it or in refusing to make any corrections in it. Except for a ruling on evidence, which will be later discussed, the only issue, and the basic one, is the claim that the court erred in rendering judgment on the basis of the conclusions that the services, materials and equipment furnished by the plaintiffs inured to the benefit of Martin Olson and Martin Olson, Inc., and that those defendants acted through the agency or instrumentality of The East Haven Homes, Inc.

The essential facts, as found by the referee, may be summarized as follows: In 1943, Martin Olson, subsequently referred to as Olson, caused The East Haven Homes, Inc., which we shall call East Haven, to be incorporated. Two hundred shares of stock were issued, of which Olson received 198; the other two shares were issued, one each, to his

lawyer and his bookkeeper. Olson was president, treasurer and a director. He continued as president until November, 1955, and as treasurer until November, 1962, and, throughout all the dealings hereinafter related, he controlled East Haven and was empowered to sign all checks for it.

During 1952 and 1953, Olson personally acquired land in Groton for the purpose of erecting a shopping center. In April, 1954, he requested the plaintiffs to submit, and the plaintiffs did submit, prices for clearing and grading this land. The terms were mutually agreeable, and the plaintiffs began the work, setting the account on their records under the heading "Martin Olson". Thereafter, and before any payment was made, Olson told the plaintiffs to send the bills to East Haven, and the plaintiffs did so, keeping their records variously in the names of Olson and East Haven.

In 1954, Olson caused Martin Olson, Inc., hereinafter called Olson, Inc., to be incorporated; in it he owned, personally or as trustee for three of his minor children, thirty-two of the forty shares of issued stock. Olson was president and treasurer and in full control of the corporation from its inception until October, 1959. He and two of his children were the directors, and a son was vice-president. Thereafter, Olson quitclaimed a substantial part of his Groton land to Olson, Inc., which also acquired additional adjoining land from private owners. The plaintiffs continued to work on the land, known to them only as the Groton shopping center, unaware of any change in title. Olson, or in his absence his son, directed the work. In 1955, Olson, Inc., reconveyed part of the land to Olson.

While the plaintiffs were at work on the Groton

land, Olson and Olson, Inc., acquired land for a shopping center in New London. In 1955, Olson caused The New London Shopping Center, Inc., to be incorporated. Olson was president and treasurer of that corporation and held all the stock personally or as trustee for his three minor children. Thereafter, Olson, this time describing himself as either "of" or "acting for" East Haven, made three contracts with the plaintiffs for work to be done and materials to be furnished in developing the New London shopping center land.

Later, Olson, Inc., voted to sell a large part of its New London land to The New London Shopping Center, Inc., which then had little if any capital funds, for $177,000, and Olson, as president, signed the deed. Meantime, East Haven voted to contract with Olson, Inc., to erect a shopping center in Groton for not over $450,000 and to contract with The New London Shopping Center, Inc., to erect a shopping center in New London for not over $1,700,000, but no such contracts were ever executed. While this was going on, the plaintiffs were continually working on the properties both in Groton and New London; and East Haven, with fixed assets consisting of office furniture, a few small tools and cars and a truck of small value, had neither the funds nor the equipment to construct either of the shopping centers. Nevertheless, East Haven, acting by Olson or his son, the vice-president of Olson, Inc., engaged various contractors for both projects. Funds for the construction of both projects were provided by a bank loan of $1,700,000 secured by a mortgage given by The New London Shopping Center, Inc., the proceeds from which were paid over to East Haven. Neither corporation was able, with these funds, to complete the New London project,

and Olson besought the lending bank for additional funds.

To meet the lending bank's demand, Olson caused Viking, Inc., to be formed, to which The New London Shopping Center, Inc., conveyed a part of its land, which Viking, Inc., on the same day mortgaged to the lending bank for a loan of $650,000. Olson controlled, and was president, treasurer and a majority stockholder of, Viking, Inc., and was authorized by it to borrow such sums as he deemed advisable. The proceeds of the $650,000 loan were paid over to East Haven and used to pay bills on the New London project, and Viking, Inc., acting by Olson as its president, reconveyed to The New London Shopping Center, Inc., the land which was mortgaged to secure, and was covered by, the $650,000 mortgage.

During the month after Viking, Inc., was formed, Olson, Inc., acquired a tract of land in Waterford on which the plaintiffs also worked under a contract with East Haven. Thereafter, The New London Shopping Center, Inc., was merged into Olson, Inc., the two corporations continuing under the name of Olson, Inc., which remained under the full control of Olson. A few months later Olson, Inc., quitclaimed a substantial portion of its Groton land to Olson after Olson had notified the plaintiffs that, owing to the financial status of East Haven, "we would not be in a position to discuss settlement with you for at least another four months." About two months before this suit was brought, Olson and his children conveyed their stock in Olson, Inc., to a syndicate, so that Olson no longer controls the corporation.

For five years subsequent to April, 1954, the plaintiffs had furnished labor, materials and equip-

ment on the aforementioned lands in Groton, New London and Waterford to an amount in excess of $192,752.66, all of which labor, materials and equipment inured to the benefit of Olson and Olson, Inc. The plaintiffs had been paid $169,652.66 by checks of East Haven, of which an aggregate of $97,401.26 had been signed by Olson and the balance by his son as vice-president of East Haven. The balance owed to the plaintiffs as of December 31, 1959, was $23,100.

The offices maintained by Olson, Olson, Inc., East Haven, The New London Shopping Center, Inc., and Viking, Inc., were all at the same address, and Olson's secretary was also secretary and bookkeeper for Olson, Inc., and East Haven. East Haven was originally formed for the purpose of building homes and, prior to 1954, engaged in that and other construction work on property of Olson and others. During the period covered by the plaintiffs' work, East Haven maintained an office and a checking account, kept corporate and financial records, filed corporation returns, and had employees. The record is completely silent as to any similar activity or conduct on the part of any of the other corporations involved except for the single meeting of Olson, Inc., at which that corporation voted to sell land to The New London Shopping Center, Inc., for $177,000, and the single meeting of Viking, Inc., which authorized Olson to borrow such sums as he deemed advisable. The only corporate action found to have been taken by East Haven relating to these projects consists of the two votes authorizing contracts with Olson, Inc., which were never consummated, to erect shopping centers in Groton and New London.

The referee concluded that East Haven, in all its dealings, was the agent of Olson and Olson, Inc.

The defendants not only denied this agency but also claimed that no services, materials or equipment furnished by the plaintiffs inured to the benefit of Olson or Olson, Inc., and that neither of those defendants was indebted to the plaintiffs. The court concluded, in substance, that the referee could reasonably find that Olson transacted business as an individual and also through corporate entities under his control and that all of the services rendered by the plaintiffs inured to the benefit of Olson and Olson, Inc. The second portion of this conclusion requires no discussion. The facts recited demonstrate clearly enough that Olson or Olson, Inc., received the benefit of the plaintiffs' services and the materials and equipment furnished by them. It is the first portion of the conclusion which poses the question for decision, namely, that Olson transacted the business as an individual and through corporate entities under his control.

Although Olson was the person with whom the plaintiffs dealt, he directed them to look to East Haven for payment, and the plaintiffs did so. All checks issued in payment of bills rendered were East Haven checks signed by either its vice-president or by Olson, who was its president. East Haven was, as a corporation, a separate legal entity. It must be assumed, from the facts found, that the plaintiffs undertook to deal with this corporation. The facts indicate that they were unaware of, and probably indifferent to, the identity of the owners of the property, who were to receive the actual benefit of their work. Nothing is indicated to warrant the conclusion that Olson ever enlightened them on this subject or that they ever asked him to do so. These circumstances did not prevent the plaintiffs, once they learned that their

undertaking was for the benefit of Olson and Olson, Inc., from seeking to hold them, as they did in this action. *Simon* v. *Fernandez,* 100 Conn. 438, 442, 123 A. 904; *Merrill* v. *Kenyon,* 48 Conn. 314, 319; see *Fleischer* v. *Wein,* 92 Conn. 372, 374, 102 A. 769. So long as other requirements which justified a recovery were met, the plaintiffs were entitled to hold Olson and Olson, Inc., for the amount due them. And this brings us to the basic question of the plaintiffs' right to look beyond East Haven, the corporate entity with which they dealt, to Olson and Olson, Inc., for a recovery of the amount due them.

The referee and the court based this right on agency. No express agency was found to exist, and, consequently, either an implied agency was meant, or the term "agency" was loosely used, as is sometimes done, to pierce the shield of immunity afforded by the corporate structure in a situation in which the corporate entity has been so controlled and dominated that justice requires liability to be imposed on the real actor. 1 Fletcher, Corporations (Perm. Ed. 1963 Rev.) § 43; Ballantine, Corporations (Rev. Ed.) § 136. The complaint alleged that East Haven was "the agent or instrumentality" of Olson and Olson, Inc. We think that it was the latter.

Courts will disregard the fiction of separate legal entity when a corporation "is a mere instrumentality or agent of another corporation or individual owning all or most of its stock." *Hoffman Wall Paper Co.* v. *Hartford,* 114 Conn. 531, 535, 159 A. 346; see *Humphrey* v. *Argraves,* 145 Conn. 350, 354, 143 A.2d 432; *Swiss Cleaners, Inc.* v. *Danaher,* 129 Conn. 338, 345, 27 A.2d 806; *Hill* v. *Jones,* 118 Conn. 12, 17, 170 A. 154. "Under such circumstances the general rule, which recognizes the individuality of

corporate entities and the independent character of each in respect to their corporate transactions, and the obligations incurred by each in the course of such transactions, will be disregarded, where, as here, the interests of justice and righteous dealing so demand." *Connecticut Co.* v. *New York, N.H. & H.R. Co.,* 94 Conn. 13, 26, 107 A. 646; *New Haven Metal & Heating Supply Co.* v. *Danaher,* 128 Conn. 213, 222, 21 A.2d 383. The circumstance that control is exercised merely through dominating stock ownership, of course, is not enough. *Hoffman Wall Paper Co.* v. *Hartford,* supra; see *Kulukundis* v. *Dean Stores Holding Co.,* 132 Conn. 685, 689, 47 A.2d 183. There must be "such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal." 1 Fletcher, op. cit., p. 205.

In the present case, Olson, Inc., owned none of the stock of East Haven. On the other hand, Olson held a dominating stock interest in both East Haven and Olson, Inc., and was president, treasurer and a director of both corporations. It is not the fact that he held these positions which is controlling but rather the manner in which he utilized them. The essential purposes of the corporate structure, including stockholder immunity, must and will be protected when the corporation functions as an entity in the normal manner contemplated and permitted by law. When it functions in this manner, there is nothing insidious in stockholder control, interlocking directorates or identity of officers. When, however, the corporation is so manipulated by an individual or another corporate entity as to become a mere puppet or tool for the manipulator, justice may require the courts to disregard the cor-

porate fiction and impose liability on the real actor. *Wenban Estate, Inc.* v. *Hewlett,* 193 Cal. 675, 697, 227 P. 723; *Minifie* v. *Rowley,* 187 Cal. 481, 488, 202 P. 673; *United Transit Co.* v. *Nunes,* 99 R.I. 501, 508, 209 A.2d 215, and cases cited; see *Starr Burying Ground Assn.* v. *North Lane Cemetery Assn.,* 77 Conn. 83, 92, 58 A. 467. It is because of this that there have arisen what are called the "instrumentality" or "identity" rules. Powell, Parent and Subsidiary Corporations §§ 2, 3.

The instrumentality rule requires, in any case but an express agency, proof of three elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of. *Lowendahl* v. *Baltimore & O.R. Co.,* 247 App. Div. 144, 157, 287 N.Y.S. 62; *Fisser* v. *International Bank,* 282 F.2d 231, 238 (2d Cir.); Powell, op. cit. §§ 2, 3; see *Steven* v. *Roscoe Turner Aeronautical Corporation,* 324 F.2d 157, 160 (7th Cir.).

Complementing the instrumentality rule is the identity rule. Powell, op. cit. § 24. Its application is illustrated in *Luckenbach S.S. Co.* v. *W. R. Grace & Co.,* 267 Fed. 676 (4th Cir.). In that case, Edgar F. Luckenbach owned 94 percent of the stock of the Luckenbach Steamship Com-

pany and almost 90 percent of the stock of the Luckenbach Company. The Luckenbach Steamship Company had a capital of $10,000 and owned no ships. The Luckenbach Company was capitalized at $800,000 and did own ships which it leased to the steamship company. Both corporations had the same officers and directors, and Luckenbach was president of and personally managed both. When the steamship company defaulted on a contract with W. R. Grace and Company, the latter, in a suit against the two corporations, was allowed recovery against the Luckenbach Company. The court said (p. 681): "For all practical purposes the two concerns are one and it would be unconscionable to allow the owner of this fleet of steamers, worth millions of dollars, to escape liability because it had turned them over a year before to a $10,000 corporation, which is simply itself in another form." The proposition has been otherwise expressed as follows: "If plaintiff can show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise." *Mull v. Colt Co.,* 31 F.R.D. 154, 163 (S.D.N.Y.); *Walkovszky v. Carlton,* 24 App. Div. 2d 582, 583, 262 N.Y.S.2d 334.

The facts in the present case are, beyond question, that Olson caused the creation of both East Haven and Olson, Inc., and thereafter completely dominated and controlled not only them but his other corporate creations. All shared the same

office. All the work and material furnished by the plaintiffs went into land which, after being juggled about, came to rest in Olson or Olson, Inc. The record is significantly silent with regard to any formal corporate action by the directors or stockholders of any of the several corporations except in the insignificant instances specifically mentioned. See *Namura* v. *Machulsky,* 96 Conn. 465, 467, 114 A. 672. East Haven had no sufficient funds of its own and acquired no funds for the work on its own initiative. It had no proprietary interest in the property on which the work was done, and, so far as appears, it gained nothing from whatever part it played in the transaction. Its domination and control are aptly defined in *Lowendahl* v. *Baltimore & O.R. Co.,* supra, 154, namely, "a domination and control so complete that the corporation may be said to have no will, mind or existence of its own and to be operated as a mere department of the business of the stockholder." With no showing of any responsible corporate action of its own, it was used by Olson for the benefit of Olson and Olson, Inc. On the facts established, the cause of justice would not be served by denying to the plaintiffs the amount found due them and unpaid because of the inadequate resources of East Haven.

We do not wish to be understood to countenance, by anything we have said here, the imposition of the legitimate indebtedness of a corporation upon a majority stockholder in derogation of his legal immunity merely because of the corporate control inherent in his stock ownership. The present case presents a set of circumstances far different from that. The only reasonable meaning to attach to the transactions spread upon this record is that East Haven undertook no obligation of its own to the

plaintiffs, was financially unable to cope with the actual transaction, and reaped no benefit from it. The undertaking throughout was Olson's, planned and carried out through his various other corporate creatures for his own and Olson, Inc.'s, enrichment, a part of which, if the plaintiffs were to be denied a recovery, would consist of the amount which East Haven, as the plaintiffs' ostensible debtor, is unable to pay because Olson and Olson, Inc., have not provided the final necessary funds.

On the basis of the referee's report, the court could properly conclude that Olson so completely controlled East Haven that that corporation had "no separate mind, will or existence of its own"; see 1 Fletcher, Corporations (Perm. Ed. 1963 Rev.) p. 205; that the control was used to perpetrate an unjust act in contravention of the plaintiffs' rights; and that it caused the unjust loss complained of. Consequently, a judgment against Olson was warranted. The court could, with equal propriety, reach the conclusion that the identity of Olson and Olson, Inc., was such that judgment against Olson, Inc., was warranted. The court in fact rendered judgment for the full amount against both Olson and Olson, Inc. This aspect of the judgment is not in issue since neither of those defendants has claimed that the other is either solely or partially responsible for the amount found due. Indeed, each of those two defendants steadfastly denied that either was liable to the plaintiffs for anything.

A ruling on evidence remains to be considered. After deeds had been offered to show conveyances of the land in Groton to and from Olson and Olson, Inc., maps of the area which had been filed several years later were offered "to assist the Court in following the transactions here." The defendants

objected on the ground that "the map doesn't clearly show the condition during the period that we are involved in." During a lengthy colloquy, the plaintiffs added a statement that the map in question was offered "to merely show locations of where Martin Olson ended up owning." The referee observed: "The only purpose I can see of having a map in anyway is so that the witness, if he can, will point out some place on the map where he says he worked." The maps were admissible to enable the court to visualize the general situation. *Dawson* v. *Davis,* 125 Conn. 330, 332, 5 A.2d 703. The referee placed no such limitation, however, in admitting the maps in evidence. The defendants now argue that the maps were offered to show Olson's ownership of the land and were inadmissible for that purpose. The objection made at the time of the offer did not clearly raise this issue, and the report shows that the referee relied on deeds rather than the maps to establish ownership. The ruling was harmless.

There is error in the form of the judgment, it is set aside and the case is remanded with direction to correct the judgment by adjudging that the defendant The East Haven Homes, Inc., recover of the plaintiffs its costs, and otherwise to render judgment as on file.

In this opinion KING, C. J., and RYAN, J., concurred.

HOUSE, J. (dissenting). I have no quarrel with the statement of legal principles expounded in the majority opinion, but I do not agree that the facts found by the referee support a conclusion that the control which the defendants Martin Olson and Martin Olson, Inc., undoubtedly did exercise over The East Haven Homes, Inc., was used by them or

either of them "to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of" the plaintiffs' legal rights. As the majority opinion recognizes, proof that the controlled corporation was so used is a condition precedent to the imposition of liability on the controlling individual or corporation under the instrumentality rule. "It is true that courts will disregard legal fictions, including that of a separate corporate entity, when they are used for fraudulent or illegal purposes. Unless something of the kind is proven, however, to do so is to act in opposition to the public policy of the state as expressed in legislation concerning the formation and regulation of corporations." *Kulukundis* v. *Dean Stores Holding Co.,* 132 Conn. 685, 689, 47 A.2d 183; see *Humphrey* v. *Argraves,* 145 Conn. 350, 354, 143 A.2d 432; *Hoffman Wall Paper Co.* v. *Hartford,* 114 Conn. 531, 534, 159 A. 346; *Bartle* v. *Home Owners Cooperative, Inc.,* 309 N.Y. 103, 106, 127 N.E.2d 832. The referee who heard the evidence in this case did not find that this essential element had been proven, nor, in my opinion, do the facts found support a conclusion that it existed. Accordingly, I believe that there was error in the judgment and it should be reversed.

COTTER, J. (dissenting). I cannot agree with the conclusion of the majority that the "only reasonable meaning to attach to the transactions spread upon this record is that East Haven undertook no obligation of its own to the plaintiffs, [and] was financially unable to cope with the actual transaction." The East Haven Homes, Inc., was organized as a general contractor in 1943. Thereafter,

and over a period of several years, it built a large number of individual homes, a fifty-seven unit apartment house, a bank building, and several other commercial structures. In 1954, eleven years after it had been formed, East Haven Homes engaged the plaintiffs to do certain clearing work. From then until June of 1959, it paid them $169,652.66 for services rendered. East Haven Homes then apparently became insolvent, with an unpaid balance of $23,100 on this account. These facts, together with others recited in the majority opinion, support a conclusion that Martin Olson used his corporations to engage in speculative business undertakings, that these corporations borrowed funds, exchanged properties and undertook obligations in a free and easy fashion, and even that Olson structured a corporate network with a weak capital foundation, but they do not reasonably support the conclusion, made for the first time in this court, that "control [by Olson] was used to perpetrate an unjust act in contravention of the plaintiffs' rights." Indeed, it appears equally possible that Olson's entire corporate empire went into eclipse in 1960 and that East Haven Homes was merely a victim of this general financial decline. In my opinion, the record does not justify overriding the principle of a shareholder's limited liability.

The practice of disregarding the corporate entity should be undertaken with great caution. This principle is fully applicable in situations where the corporation is dominated by a single individual.[1] *Hoffman Wall Paper Co.* v. *Hartford,* 114 Conn.

---

[1] "That a 'one man' corporation is a valid jural person was decided by the House of Lords in 1897, and has not been doubted ever since." *United States* v. *Weissman,* 219 F.2d 837, 838 (2d Cir.) (L. Hand, J.).

531, 535, 159 A. 346; *Miller Lumber Corporation* v. *Miller,* 225 Ore. 427, 436, 357 P.2d 503; see note, 100 A.L.R.2d 385. Persons dealing with such corporations may refuse to contract without a personal guarantee of payment from the principal. See *Wagner* v. *Manufacturers' Trust Co.,* 237 App. Div. 175, 178, 261 N.Y.S. 136, aff'd, 261 N.Y. 699, 185 N.E. 799. The plaintiffs in the present case, however, elected to deal with the corporation and in fact were paid substantial sums by the corporation over a long period of time.

The underlying rationale behind the statutory granting of stockholder immunity from corporate debts has been stated as follows: "Obviously the useful and beneficial role of the corporate concept in the economic and business affairs of the modern day world would be destroyed if the rule of freedom from individual liability for corporate obligations did not obtain. The protection of limited liability for venture or investment capital is essential to the efficient operation of a system of free enterprise. Such protection from individual liability encourages and promotes business, commerce, manufacturing and industry which provides employment, creates sales of goods and commodities and adds to the nation's economic and financial growth, stability and prosperity." *Johnson* v. *Kinchen,* 160 So. 2d 296, 299 (La.). The majority opinion in the present case, although not directly undermining this principle, casts a doubtful shadow in its direction.

The new rule which the majority has adopted as the test of the personal liability of a corporation's dominant shareholder is a broad one, will be difficult to apply realistically and is not warranted by the record in the present case. Close corporations, although individual entities from a legal stand-

point, are normally no more than vehicles for the goals and motives of their principals. The law is not necessarily advanced by adopting a rule which includes a presumption that this kind of corporation may have a "separate mind, will, or existence of its own." Under the circumstances of this case, I would reaffirm the "fraudulent or illegal purposes" test enunciated in such cases as *Humphrey* v. *Argraves,* 145 Conn. 350, 354, 143 A.2d 432; *Kulukundis* v. *Dean Stores Holding Co.,* 132 Conn. 685, 689, 47 A.2d 183; and *Hoffman Wall Paper Co.* v. *Hartford,* 114 Conn. 531, 534, 159 A. 346.