TERRANCE DAVENPORT *v.* DANIEL J. QUINN ET AL.
(AC 17648)

Landau, Schaller and Dupont, Js.

Argued January 28—officially released May 18, 1999

*Kenneth J. Bartschi*, with whom were *Karen L. Murdoch* and, on the brief, *Harold R. Cummings*, for the appellants (defendants).

*Dennis P. O'Connor II*, with whom were *I. Edmund Hare, Jr.*, and, on the brief, *Amelia G. Nord*, for the appellee (plaintiff).

*Opinion*

SCHALLER, J. The plaintiff filed this action seeking to satisfy the default judgment that he had obtained in a prior action against the Pub of Manchester, Inc. (Pub, Inc.), for $75,000 in damages. Pub, Inc., was doing business as a bar under the name Bowties. The plaintiff sought to pierce the corporate veil, claiming that the defendant Daniel Quinn[1] was the alter ego of Pub, Inc., and that he had fraudulently transferred corporate assets in violation of General Statutes §§ 52-552a through 52-552l in order to avoid payment of the default judgment. The trial court held that the defendants could not successfully attack the underlying default judgment and that the plaintiff was entitled to pierce the corporate veil. The defendants appeal from that judgment claiming that the trial court improperly concluded that (1) the default judgment arose from a complaint stating a cause of action other than a violation of Connecticut's Dram Shop Act, General Statutes § 30-102,[2] and (2) that

[1] NNIUQ, Inc., a Connecticut corporation owned by Quinn as its sole shareholder, is also a defendant in the present appeal.

[2] General Statutes § 30-102 provides in relevant part: "If any person, by himself or his agent, sells any alcoholic liquor to an intoxicated person, and such purchaser, in consequence of such intoxication, thereafter injures the person or property of another, such seller shall pay just damages to the person injured, up to the amount of twenty thousand dollars, or to persons injured in consequence of such intoxication up to an aggregate amount of

the defendants are liable to the plaintiff for a judgment in a case in which they were not parties and, therefore, had no opportunity to litigate. We affirm the judgment of the trial court.

The following facts found by the trial court are necessary to the resolution of this appeal. On June 6, 1992, the plaintiff was a patron at Bowties when, while he was standing on the sidewalk outside the bar, he was attacked by a group of individuals who had just left Bowties. The plaintiff sustained injuries in the attack.[3]

fifty thousand dollars, to be recovered in an action under this section, provided the aggrieved person or persons shall give written notice to such seller within sixty days of the occurrence of such injury to person or property of his or their intention to bring an action under this section. . . . Such notice shall specify the time, the date and the person to whom such sale was made, the name and address of the person injured or whose property was damaged, and the time, date and place where the injury to person or property occurred. No action under the provisions of this section shall be brought but within one year from the date of the act or omission complained of."

[3] The relevant portions of the plaintiff's complaint allege:

"1. That on or about June 6, 1992, the plaintiff was a lawful patron on the defendant's premises and had been drinking an alcoholic beverage for which he paid.

"2. That on that date at about the same time, a number of other patrons on the defendant's premises were intoxicated and the defendant then and negligently, wrongfully and unlawfully sold liquors to said intoxicated persons and continued to sell liquors further contributing to the state of intoxication and after said patrons had imbibed to such a state to become obstreperous, boisterous and prone to violent action (of which the defendant had notice and knowledge).

"3. That on the above stated date, as the plaintiff was standing on the sidewalk that enters the defendant's premises under a canopy with a friend and as a direct result of the defendant's negligence in violation of [§ 30-102] (notice of which has been sent to the defendant . . . ) the plaintiff was assaulted by other patrons.

"4. That the negligence of the defendant and its violation of law, in addition to that hereinabove alleged, consisted of:

"a) Selling intoxicating liquors to patrons of its establishment when they were intoxicated causing them to become further intoxicated, knowing that the reaction of the intoxicating liquors on these individuals, and that the conduct of these patrons while intoxicated created a grave risk of harm to other patrons of the defendant;

Pursuant to § 30-102, the plaintiff sent notice via certified mail to Pub, Inc., on August 11, 1992, notifying it that he intended to file a claim. That notice was returned to the plaintiff by the postal service as unclaimed. On or about May 25, 1993, the plaintiff filed his single count complaint in Superior Court. In the original action, the plaintiff alleged liability under the Dram Shop Act and common-law negligence for an assault and battery that occurred outside Bowties. The original writ of summons and complaint were served in hand on Harold R. Cummings, the attorney for the present defendants and the agent for service of process for Pub, Inc., on or about May 25, 1993. Service of process was also made on or about the same date on Bowties' permittee, Karl T. Oberlander.

The defendants in the underlying action failed to appear. Subsequently, the plaintiff filed a motion for

"b) in failing to adequately supervise the premises to control and prevent intoxicated patrons from conduct resulting in harm to the plaintiff and failing to warn the plaintiff of the hazard there and then existing or to take other necessary steps for their protection;

"c) in failing to call the police at the earliest possible time to protect the plaintiff;

"d) in failing to intervene to protect the plaintiff from a continuing assault;

"e) in knowing that the patrons of Bowties were members of a class of persons known to create a high risk of injury to the public when consuming intoxicating beverages;

"f) in knowing that under the laws of the state of Connecticut, [§ 30-102] specifically prohibits the sale and service of alcoholic beverages to said class of persons and the policies and procedures of the defendant should have prohibited the sale and/or service of alcoholic beverages to said class of persons.

"5. That the defendant nevertheless sold and served intoxicating beverages to its intoxicated patrons who consumed the same on the defendant's premises.

"6. That the sale and service of such beverages by the defendant constituted gross negligence and negligence per se or alternatively ordinary negligence which was the proximate cause of the injuries and damages suffered by the plaintiff.

"7. That numerous patrons attacked the plaintiff as a proximate result of being sold and/or served intoxicating beverages by the defendant, thereby causing the following injuries and damages to the plaintiff . . . ."

default and sent copies of the motion to both Cummings and Oberlander. Neither Pub, Inc., nor Oberlander filed an appearance or pleadings. The plaintiff then moved for a hearing in damages and notified both Cummings and Oberlander that the hearing would take place on December 20, 1993.

On that date, the trial court held a hearing in damages, at which the defendant again did not appear. After the hearing, the trial court rendered a default judgment for the plaintiff, awarding damages in the amount of $75,000 plus $214 in attorney's fees. In March, 1994, the sheriff unsuccessfully attempted a property execution against Pub, Inc.

The plaintiff filed the complaint in the present action on November 21, 1994. The defendants in the present case filed an answer on February 20, 1995. No special defenses were filed. Prior to the trial in the present case, there had been no action on behalf of Quinn, Pub, Inc., or the defendant NNIUQ, Inc., a Connecticut corporation owned by Quinn, disputing either the trial court's jurisdiction or the default judgment in the underlying case. Additional facts will be set forth as they become necessary.

I

The defendants first claim that the underlying default judgment is void because (1) the original complaint alleges only a violation of the Dram Shop Act and (2) the plaintiff's notice pursuant to § 30-102 was untimely. We disagree.

This case presents an interpretation of the pleadings in the underlying action, which presents a question of law and is subject to de novo review on appeal. *Grimes v. Housing Authority*, 242 Conn. 236, 249, 698 A.2d 302 (1997). Additionally, we are called on to decide whether the trial court properly determined that the plaintiff's statutory notice under § 30-102 was defective. Our

review is plenary concerning that issue also. See *Doe* v. *Roe*, 246 Conn. 652, 660, 717 A.2d 706 (1998).

## A

At common law, there was no cause of action stemming from the service of alcohol to a tortfeasor because the chain of causation was determined to be broken by the person's voluntary consumption of the intoxicating beverage. *Kowal* v. *Hofher*, 181 Conn. 355, 357–58, 436 A.2d 1 (1980). "[The Dram Shop Act], in situations where it was applicable, displaced the common-law rule that the proximate cause of intoxication was not the furnishing of the liquor but its consumption." *Nolan* v. *Morelli*, 154 Conn. 432, 437, 226 A.2d 383 (1967). There presently is no need for an injured party to show causation; § 30-102 dispenses with that need. Our Supreme Court has mandated that the only cause of action arising from the negligent service of alcohol to intoxicated persons shall arise under the Dram Shop Act. *Quinnett* v. *Newman*, 213 Conn. 343, 345, 568 A.2d 786 (1990); *Kowal* v. *Hofher*, supra, 357.

While our Supreme Court has limited causes of action arising from injuries sustained as a result of the negligent service of intoxicating beverages to intoxicated persons to § 30-102, it has not abrogated causes of action arising from reckless and wanton misconduct. *Kowal* v. *Hofher*, supra, 181 Conn. 362. "The Act is concerned only with the liability of a seller, as such, of intoxicating liquor. But if, under any circumstances, any alternative common-law right against a seller, as such, exists, it would, to the extent that it exists, necessarily permit the avoidance, through use of a common-law action, of the provision of the Act restricting the amount of damages recoverable . . . . The Act itself, however, contains no provision expressly making it an exclusive remedy against sellers, as such, of intoxicating liquor for damages to person or property caused by

the intoxication of a purchaser, whether those damages are sustained by the purchaser himself or by innocent third parties." *Nolan* v. *Morelli*, supra, 154 Conn. 439 n.2.

The plaintiff's complaint alleges numerous facts that sound in a violation of the Dram Shop Act. See footnote 3. The underlying complaint, however, also alleges that Pub, Inc., and Oberlander were negligent in failing (1) to call the police in a timely manner and (2) to intervene in the ongoing assault.

The plaintiff alleges essentially that the defendants in the underlying action breached the duty they owed to the plaintiff as a patron of Bowties. The general rule in Connecticut is that a party is not under a duty to aid unless a special relationship exists between it and the victim. *State* v. *Miranda*, 245 Conn. 209, 221, 715 A.2d 680 (1998). A store owner owes a duty to an invitee to keep the premises in a reasonably safe condition. *Gulycz* v. *Stop & Shop Cos.*, 29 Conn. App. 519, 521, 615 A.2d 1087, cert. denied, 224 Conn. 923, 618 A.2d 527 (1992). Furthermore, a possessor of property must " 'act as a reasonable [person] to avoid harm . . . even from intentional attacks on the part of such third persons.' Prosser, Law of Torts (4th Ed.) § 61, p. 395." *Merhi* v. *Becker*, 164 Conn. 516, 520, 325 A.2d 270 (1973).

When reviewing the facts alleged in a complaint, we consider them in the light most favorable to the plaintiff. *Amodio* v. *Cunningham*, 182 Conn. 80, 82, 438 A.2d 6 (1980). The plaintiff has, in essence, alleged that the defendants in the underlying case failed to meet their duty of care as possessors of property.[4] The plaintiff alleges that he was a lawful patron on the premises of the defendants. He has alleged, therefore, that he was a business invitee of Bowties. Accordingly, Bowties and Oberlander owed him, as a business invitee, a duty to

---

[4] The plaintiff also claims, in his brief, that he alleged a claim based on common-law recklessness. The complaint does not support that assertion.

act as reasonable persons to avoid harm. This claim does not sound in dram shop liability. The allegation that a possessor of property failed to keep the premises safe from dangers applies to *all* possessors of property, sellers of alcoholic beverages and others alike.[5]

Additionally, the trial court in the underlying action awarded damages in the amount of $75,000. The statutory maximum allowed under § 30-102 is $20,000.[6] We conclude that the trial court's award in the default judgment in excess of $20,000 indicates that the judgment was based on a theory of liability beyond a violation of the Dram Shop Act. Furthermore, we agree with the trial court that "[a]ll of these allegations go beyond the allegations required to make out a claim under § 30-102."

The defendants claim, in their brief, that the plaintiff did not allege the existence of a special relationship between him and Bowties nor did he allege that the assault occurred on the premises of Bowties. In essence, the defendants are now challenging the legal sufficiency of the plaintiff's original complaint. This is not an appropriate time for such a challenge. Practice Book § 10-6 provides in relevant part: "The order of pleading shall be as follows:

"(1) The plaintiff's complaint.

"(2) The defendant's motion to dismiss the complaint.

"(3) The defendant's request to revise the complaint.

---

[5] The determination of whether the sidewalk outside Bowties is on its premises is a factual issue. Because there were no factual findings as to whether the sidewalk was on Bowties' premises, we make no conclusion as to whether (1) the sidewalk is on Bowties' premises and (2) the plaintiff was injured on Bowties' premises.

[6] The defendants did not provide us with a copy of the transcript of the hearing in damages for our review. We cannot determine, therefore, how the trial court apportioned the damages. It is the appellant's duty to provide an adequate record for review. Practice Book § 61-10.

"(4) The defendant's motion to strike the complaint. . . ."

Practice Book § 10-39 (a) provides in relevant part: "Whenever any party wishes to contest (1) the legal sufficiency of the allegations of any complaint . . . that party may do so by filing a motion to strike the contested pleading or part thereof." The trial court properly stated in its memorandum of decision that "if the defendants wished to move to strike some or all of these allegations on the grounds that they were properly subsumed within a dram shop count, they could have done so."

Pub, Inc., and Oberlander failed to contest the sufficiency of the pleadings.[7] For unknown reasons both

[7] The defendants contend that the plaintiff bears the burden of pleading his case adequately and that a defendant is under no burden to strike a legally insufficient complaint. They claim that because the plaintiff failed to allege his different causes of action sufficiently, the judgment in the underlying case is invalid. The defendants cite *Tedesco* v. *Stamford*, 215 Conn. 450, 459, 576 A.2d 1273 (1990), remanded, 24 Conn. App. 377, 588 A.2d 656 (1991), rev'd, 222 Conn. 233, 610 A.2d 574 (1992), and *Anthony Julian Railroad Construction Co.* v. *Mary Ellen Drive Associates*, 39 Conn. App. 544, 546–47 n.9, 664 A.2d 1177, cert. denied, 235 Conn. 930, 667 A.2d 800 (1995), to support their position. We agree with the defendants' contention that the plaintiff has the burden of adequately pleading his case. We disagree, however, with the defendants' contention that a legally insufficient pleading in this case invalidates the underlying judgment.

The cases that the defendants cite both involve the common occurrence where the respective defendants filed an appearance. As has been repeatedly pointed out, the defendants in the underlying action failed to appear. We fail to see how an insufficient pleading would place a defendant who fails to appear at an unfair disadvantage.

While we conclude that the defendants cannot collaterally attack the default judgment, we note that our Supreme Court has held that the sufficiency of a complaint can be attacked by the defendant in the case without filing a motion to strike. See *Tedesco* v. *Stamford*, supra, 215 Conn. 461 (" 'proper way to attack a variance between pleadings and proof is by objection at the trial to the admissibility of that evidence which varies from the pleadings' "); see also *Robert S. Weiss & Associates, Inc.* v. *Weiderlight*, 208 Conn. 525, 535 n.5, 546 A.2d 216 (1988) (defendant does not bear burden to correct plaintiff's deficient pleading); *Brill* v. *Ulrey*, 159 Conn. 371, 374, 269 A.2d 262 (1970) (same); *Greenthal* v. *Lincoln, Seyms & Co.*, 67 Conn. 372,

defendants, even after being served with notice, failed to appear.[8] After the default judgment had entered, the defendants took no action to move to open the judgment. See Practice Book § 17-43. The defendants were given notice of the hearing in damages and again did not appear. We agree with the trial court that "the better time and place to have addressed these issues was during the pendency of the underlying case, not now."

The defendants further claim that, even if there were distinct causes of action, the plaintiff failed to meet the rule of practice[9] that each count be set forth separately. The proper method for the defendants in the underlying case to challenge the failure to plead separate counts was by way of a request to revise; Practice Book § 10-35 (3); which neither Pub, Inc., nor Oberlander filed. The trial court properly held that the underlying complaint alleged common-law claims in addition to a violation of the Dram Shop Act.

## B

The defendants next claim that the trial court in the underlying action lacked subject matter jurisdiction because the plaintiff's statutory notice under § 30-102 was untimely and, therefore, they are entitled to attack the judgment collaterally. We disagree.

Section 30-102 requires that a plaintiff send notice of his intent to file a claim under the Dram Shop Act to

---

378–79, 35 A. 266 (1896) (same). Again, we emphasize that the defendants in the present case were not defendants in the underlying action, and are not appealing that judgment directly.

[8] The agent for service of process of Pub, Inc., is an attorney at law in the state of Connecticut.

[9] Practice Book § 10-26 provides: "Where separate and distinct causes of action, as distinguished from separate and distinct claims for relief founded on the same cause of action or transaction, are joined, the statement of the second shall be prefaced by the words *Second Count*, and so on for the others; and the several paragraphs of each count shall be numbered separately beginning in each count with the number one." (Emphasis in original.)

the seller of the intoxicating beverages within sixty days of the alleged injury or property damage. Additionally, the notice must set forth "the time, the date and the person to whom such sale was made, the name and address of the person injured or whose property was damaged, and the time, date and place where the injury to person or property occurred. . . ." General Statutes § 30-102.

"The conclusion that the existence of a statutory right is conditioned upon compliance with the terms of the statute creating it is entirely consistent with the views [our Supreme Court has] expressed with relation to other types of rights created by statute. 'The general rule is that where a statute gives a right of action which did not exist at common law, and fixes the time within which the right must be enforced, the time fixed is a limitation [or] condition attached to the right—it is a limitation of the liability itself as created, and not of the remedy alone.' *DeMartino* v. *Siemon*, 90 Conn. 527, 528–29, 97 A. 765 (1916)." *Hillier* v. *East Hartford*, 167 Conn. 100, 106, 355 A.2d 1 (1974). "The courts of Connecticut have repeatedly held that, under such circumstances, the time limitation is a substantive and jurisdictional prerequisite, which may be raised at any time, even by the court sua sponte, and may not be waived." *Ecker* v. *West Hartford*, 205 Conn. 219, 232, 530 A.2d 1056 (1987).

Neither party has supplied us with any appellate decision that holds that compliance with the sixty day notice requirement is a jurisdictional prerequisite to sustaining a dram shop action and our own research has discovered no such case.[10] We are persuaded, however, that

---

[10] The Superior Court has, however, taken the position that meeting the sixty day requirement is a prerequisite and, therefore, failing to meet the sixty day requirement is a subject matter jurisdictional bar to sustaining an action. See *Ryan* v. *Curtis*, Superior Court, judicial district of Hartford-New Britain at Hartford (September 23, 1993) (8 C.S.C.R. 1126) (claim barred when notice delivered sixty-one days after injury); *Stevenson* v. *Edwards*,

the sixty day notice requirement is a condition precedent to maintaining an action alleging only a violation of the Dram Shop Act. Failure to file a timely notice pursuant to § 30-102 does deprive the trial court of subject matter jurisdiction. This action, however, is not barred in toto by that requirement. As we concluded above, the plaintiff's complaint in the underlying action alleged a common-law cause of action in addition to the dram shop claim. Because there is no sixty day notice requirement for a simple negligence action and the plaintiff brought his action within the two year limitations period prescribed in General Statutes § 52-584, the trial court did not lack subject matter jurisdiction over the negligence portion of the underlying action.

The defendants' claim that they may collaterally attack the underlying judgment is also flawed. "[A] provision of a judgment that exceeds the jurisdiction of a court is necessarily void and cannot be remedied merely by the lapse of time. Such a judgment is void ab initio and is subject to both direct and collateral attack. . . . If a court has never acquired jurisdiction over a defendant or the subject matter . . . any judgment ultimately entered is void and subject to vacation or collateral attack." (Citations omitted; internal quotation marks omitted.) *Pinder* v. *Pinder*, 42 Conn. App. 254, 258, 679 A.2d 973 (1996). "Unless a litigant can show an absence of subject matter jurisdiction that makes the prior judgment of a tribunal entirely invalid, he or she must resort to direct proceedings to correct perceived wrongs in the tribunal's conclusive decision. . . . A collateral attack on a judgment is a procedurally impermissible substitute for an appeal." (Citation omitted; internal quotation marks omitted.) *Joe's Pizza, Inc.*

25 Conn. Sup. 1, 2, 195 A.2d 252 (1963) (meeting sixty day requirement condition precedent to maintaining action).

v. *Aetna Life & Casualty Co.*, 236 Conn. 863, 876, 675 A.2d 441 (1996).

As we stated above, even though the dram shop portion of the action was barred because of the plaintiff's failure to provide timely notice under § 30-102, the trial court had subject matter jurisdiction over the plaintiff's common-law negligence claim. Because the trial court did not lack subject matter jurisdiction over the action, the judgment is not subject to a collateral attack. *Broaca* v. *Broaca*, 181 Conn. 463, 467, 435 A.2d 1016 (1980). The trial court properly upheld the underlying judgment.

II

The defendants next claim that the trial court improperly (1) applied the doctrine of collateral estoppel, (2) allowed the plaintiff to pierce the corporate veil and (3) found that Quinn had fraudulently conveyed the assets of Pub, Inc., in violation of the Uniform Fraudulent Transfer Act, General Statutes §§ 52-552a through 52-552*l*.[11] We disagree.

[11] General Statutes 52-552b provides in relevant part: "(3) 'Claim' means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured.

"(4) 'Creditor' means a person who has a claim.

"(5) 'Debt' means liability on a claim.

"(6) 'Debtor' means a person who is liable on a claim.

"(7) 'Insider' includes: (A) If the debtor is an individual, (i) a relative of the debtor or of a general partner of the debtor, (ii) a partnership in which the debtor is a general partner, (iii) a general partner in a partnership described in subparagraph (ii), or (iv) a corporation of which the debtor is a director, officer or person in control; (B) if the debtor is a corporation, (i) a director of the debtor, (ii) an officer of the debtor, (iii) a person in control of the debtor, (iv) a partnership in which the debtor is a general partner, (v) a general partner in a partnership described in subparagraph (iv), or (vi) a relative of a general partner, director, officer or person in control of the debtor; (C) if the debtor is a partnership, (i) a general partner in the debtor, (ii) a relative of a general partner in, a general partner of, or a person in control of the debtor, (iii) another partnership in which the debtor is a general partner, (iv) a general partner in a partnership described in subparagraph (iii), or (v) a person in control of the debtor; (D) an affiliate,

The following additional facts are necessary to the resolution of this portion of the appeal. Quinn was the sole shareholder, sole officer and director of Pub, Inc. He was also the sole shareholder, sole officer and director of the defendant NNIUQ, Inc. Quinn was also the owner of the sole proprietorship entitled "G.Q. Associates."

Quinn maintained no business office and on a weekly basis delivered all of his business' receipts and bills to his accountant, Gerald Perloff. All of the bills and

or an insider of an affiliate as if the affiliate were the debtor; and (E) a managing agent of the debtor.

* * *

"(12) 'Transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance. . . ."

General Statutes § 52-552e provides: "(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

"(b) In determining actual intent under subdivision (1) of subsection (a) of this section, consideration may be given, among other factors, to whether: (1) The transfer or obligation was to an insider, (2) the debtor retained possession or control of the property transferred after the transfer, (3) the transfer or obligation was disclosed or concealed, (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit, (5) the transfer was of substantially all the debtor's assets, (6) the debtor absconded, (7) the debtor removed or concealed assets, (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred, (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred, (10) the transfer occurred shortly before or shortly after a substantial debt was incurred, and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor."

invoices for each of the various business entities were paid by Perloff or someone on his staff. Quinn was very active in the management of his businesses and he would at times direct Perloff which bills to pay and from which account. At other times, Perloff would advise Quinn as to how to handle paying his business' bills. Perloff described Quinn as a "fastidious businessperson 'very interested in how each one of [his] organizations is doing.' " Perloff maintained separate accounting books and tax records for each business entity owned and operated by Quinn.

Perloff would routinely pay bills for one of Quinn's enterprises from the account of another of Quinn's businesses. When such a transaction occurred, Perloff would record the transaction as an "officer's loan." From 1992 through 1994, Pub, Inc., paid bills for Quinn's other entities. At the same time, Quinn's other entities paid Pub, Inc.'s bills.

For tax purposes, Pub, Inc., and NNIUQ, Inc., were subchapter S corporations. Because the corporations were S corporations, they were flow through entities,[12] filing only informational income tax returns[13] with the Internal Revenue Service (IRS). Quinn, as the sole

---

[12] Section 1366 of title 26 of the United States Code provides in relevant part: "(a) Determination of shareholder's tax liability

"(1) In general

"In determining the tax under this chapter of a shareholder for the shareholder's taxable year in which the taxable year of the S corporation ends . . . there shall be taken into account the shareholder's pro rata share of the corporation's—

"(A) items of income . . . loss, deduction, or credit the separate treatment of which could affect the liability for tax of any shareholder, and

"(B) nonseparately computed income or loss.

* * *

"(b) The character of any item included in a shareholder's pro rata share under paragraph (1) of subsection (a) shall be determined as if such item were realized directly from the source from which realized by the corporation, or incurred in the same manner as incurred by the corporation. . . ."

[13] See Internal Revenue Service form 1120S.

shareholder of the S corporations, was required to report all gains and losses from the operation of his corporations on his individual federal income tax returns. For tax purposes, Perloff advised Quinn periodically to draw a salary to document his work for a business to show the IRS that he was entitled to a salary for the work he performed on behalf of the corporations. Quinn's salaries for the years 1992, 1993 and 1994, were $29,855, $77,000 and $47,000, respectively. Yet, Quinn's reported income for the first quarter of 1994 was only $3000. Quinn, therefore, received $44,000 in income *after* Bowties had ceased operations.

In August, 1993, Quinn received notice that the building in which Bowties was located would be auctioned by the Federal Deposit Insurance Corporation in November, 1993. The auction was held then, and Quinn was not the successful purchaser. The new owner subsequently informed Quinn that Bowties would have to vacate the premises. In March, 1994, Bowties ceased operations and Pub, Inc., surrendered its liquor license to the state liquor control commission. The bar's fixtures remained on the premises as the property of the new owner. The bar's furniture was owned by Quinn's sole proprietorship, G.Q. Associates. Although Pub, Inc., was no longer doing business, it never filed corporate dissolution papers with the secretary of the state.

Quinn's first notice of the plaintiff's creditor status was in early 1994. In March, 1994, after Bowties had ceased operations, Quinn knew that the plaintiff was a creditor. At that time, Quinn drew a check from Pub Inc.'s corporate account in the amount of $5000 payable to G.Q. Associates. Another check was drawn on the account of Pub, Inc., to pay NNIUQ, Inc.'s rent in March, 1994, in the amount of $2800. While aware of the plaintiff's claim, Quinn drew a "salary" from Pub, Inc.'s corporate account in the amount of $30,177 on May 27, 1994. He then immediately deposited that "salary" back

into Pub, Inc.'s account so that funds would be available to pay other bills. A bank statement for Pub, Inc., for the period between May 31 and June 30, 1994, indicated that its account balance was $363.63.

Pub, Inc., was served with the underlying complaint on or about May 25, 1993. Numerous checks were entered in evidence showing that Pub, Inc., was paying bills for NNIUQ, Inc., doing business as Tunes or the Cactus Club, after that date. Additionally, a check was drawn on Pub, Inc.'s account to pay an American Express bill on behalf of Daniel Quinn. Some of the checks were drawn after the trial court had rendered the default judgment against Pub, Inc., and Oberlander.

A

The defendants claim that the trial court must have improperly applied the doctrine of collateral estoppel to bind them to the underlying judgment. We disagree.

"Collateral estoppel, like its cousin res judicata, presents a question of law that we review de novo. See *Tirozzi* v. *Shelby Ins. Co.*, [50 Conn. App. 680, 684, 719 A.2d 62, cert. denied, 247 Conn. 945, 723 A.2d 323 (1998)]. Collateral estoppel, or issue preclusion, prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action. . . . For an issue to be subject to collateral estoppel, it must have been fully and fairly litigated in the first action. It also must have been actually decided and the decision must have been necessary to the judgment." (Internal quotation marks omitted.) *Linden Condominium Assn., Inc.* v. *McKenna*, 247 Conn. 575, 596, 726 A.2d 502 (1999).[14]

---

[14] The defendants cite *Jackson* v. *R. G. Whipple, Inc.*, 225 Conn. 705, 717–18, 627 A.2d 374 (1993), for the proposition that the default judgment should not have preclusive effect. While it is true that in *Jackson* our Supreme Court held that the default judgment should not have preclusive effect, the Supreme Court also stated that, "in the interest of judicial economy and

The defendants argue that they did not have the opportunity to litigate the original claim and, therefore, they should not be bound by it. We do not share the defendants' concerns that the trial court improperly used collateral estoppel to bind them to the underlying judgment.

The trial court did not find the defendants liable on the original complaint. The plaintiff brought suit against the defendants in the present action in an attempt to satisfy the underlying judgment. The cause of action is based on the allegation that the defendants were parties to a fraudulent conveyance of Pub, Inc.'s assets. The plaintiff is not claiming that the defendants are the liable tortfeasors in the original action. He brought suit claiming that the defendants were essentially alter egos of Pub, Inc., and under the theory of piercing the corporate veil he is entitled to satisfaction of the underlying judgment.

We have already discussed the validity of the underlying judgment. The trial court was not faced with the possibility of the relitigation of the underlying claim and did not base its determination on the applicability of collateral estoppel. The trial court was faced with and decided new causes of action. We conclude, therefore, that the doctrine of collateral estoppel does not apply to this appeal.

### B

The defendants next claim that the trial court improperly allowed the plaintiff to pierce the corporate veil. We disagree.

Our Supreme Court discussed the concept of piercing the corporate veil in *Zaist* v. *Olson*, 154 Conn. 563, 573–74, 227 A.2d 552 (1967). "Courts will disregard the

repose for litigants, we envision some circumstances where it would be appropriate to give issue preclusive effect to a default judgment." Id., 717.

fiction of separate legal entity when a corporation is a mere instrumentality or agent of another corporation or individual owning all or most of its stock. . . . Under such circumstances the general rule, which recognizes the individuality of corporate entities and the independent character of each in respect to their corporate transactions, and the obligations incurred by each in the course of such transactions, will be disregarded, where, as here, the interests of justice and righteous dealing so demand. . . . The circumstance that control is exercised merely through dominating stock ownership, of course, is not enough. . . . There must be such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal." (Citations omitted; internal quotation marks omitted.) Id.

When determining whether piercing the corporate veil is proper, our Supreme Court has endorsed two tests: the instrumentality test and the identity test. "The instrumentality rule requires, in any case but an express agency, proof of three elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice *in respect to the transaction attacked* so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights; *and* (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of. . . .

"The identity rule has been stated as follows: If a plaintiff can show that there was such a unity of interest and ownership that the independence of the corpora-

tions had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, 187 Conn. 544, 553–54, 447 A.2d 406 (1982). The concept of piercing the corporate veil is equitable in nature and courts should pierce the corporate veil only under "exceptional circumstances." (Internal quotation marks omitted.) Id., 557.

The trial court utilized both the instrumentality rule and the identity rule to determine that the plaintiff could successfully pierce the corporate veil. It held: "[T]he evidence indicates that all three prongs [of the instrumentality rule] have been satisfied. The testimony of [Perloff] and [Quinn] in light of all the evidence made it clear that [Quinn] exercised complete control of all of the subject entities with respect to finances, policy, and business practices, so that the subject entities had no separate mind, will or existence of their own, but existed solely to benefit [Quinn]. The control was utilized to perpetrate the violation of a 'positive legal duty,' to wit, to make payment to plaintiff of the judgment entered in the underlying case. And the control and breach of duty proximately caused the injury and loss plaintiff complained of.

"Utilizing the identity rule, I conclude that the evidence compels the conclusion that [Quinn] was, at all relevant times, the 'alter ego' of all of his enterprises. The relative lack of formalities observed, the failure to completely document various transactions, the free use by the entities and [Quinn] to make 'officer's loans,' loans and pay various debts, and the payments to himself of large salaries after the claim arose, as well as

other evidence make it clear that there was such a unity of interest and ownership that the independence of the corporation, if it indeed ever existed, ceased to exist."

The trial court's determination that the instrumentality rule and identity rule requirements were met was a factual finding. We will not reverse a factual finding unless it is clearly erroneous. *State* v. *Nosik*, 245 Conn. 196, 205, 715 A.2d 673 (1998).

The evidence presented at trial showed that Quinn maintained exclusive control over both Pub, Inc., and NNIUQ, Inc. He allowed one corporation to pay for the debts of another. He, in fact, authorized such a practice. All financial transactions were controlled by Quinn. There was, in essence, no separate account for each corporation. If one corporation needed funds, Quinn authorized a transfer of funds from either his sole proprietorship or the other corporation. Quinn was fully involved in each of the business transactions of each of his entities. The trial court properly found that Quinn met the first prong of the instrumentality test.

The testimony and exhibits showed that Quinn transferred the assets out of Pub, Inc., after the plaintiff had filed his original complaint. Pub, Inc., had notice of the lawsuit, and Quinn continued his practice of commingling funds and removing assets out of Pub Inc.'s account to pay not only NNIUQ, Inc.'s expenses, but his own salary, even after Bowties ceased operations. The plaintiff entered evidence to show that Pub, Inc.'s account balance was less than $400, far less than the $75,000 judgment against it. The trial court properly found that Quinn met the second prong of the instrumentality test.

The evidence showed that the plaintiff attempted a property execution on Pub, Inc., but was unsuccessful. If Pub, Inc., had possessed sufficient funds to satisfy the judgment, the plaintiff would not have had to bring

the present case. The trial court properly found that Quinn's actions were the proximate cause of the plaintiff's loss.

As for the identity rule, the evidence showed a complete lack of corporate formality, which was approved by Quinn. Additionally, Pub, Inc., paid Quinn's personal bills and bills of the other corporation. When Pub, Inc., ceased doing business, it never dissolved, yet it paid Quinn $44,000 in income. We conclude that the "exceptional circumstances" envisioned by the Supreme Court in *Angelo Tomasso, Inc.*, exist in the present case. We therefore conclude that the trial court properly determined that Quinn was the alter ego of Pub, Inc., and allowed the plaintiff to pierce the corporate veil.

C

The defendants next claim that the trial court improperly found that they were involved in a fraudulent conveyance in violation of §§ 52-552a through 52-552*l*. We disagree.

The question of whether a fraudulent conveyance took place is solely a question of fact to be determined by the trier. *Picataggio* v. *Romeo*, 36 Conn App. 791, 793–94, 654 A.2d 382 (1995). For a plaintiff to succeed, "[a fraudulent conveyance] must be proved, if at all, by clear, precise and unequivocal evidence." (Internal quotation marks omitted.) Id. We will not disturb the trial court's factual findings unless they are clearly erroneous and unsupported by the record. *State* v. *Nosik*, supra, 245 Conn. 205. Whether the plaintiff was entitled to set aside the conveyances, however, involves a mixed question of law and fact, and our review is plenary. See *Mercer* v. *Commissioner of Correction*, 51 Conn. App. 638, 644, 724 A.2d 1130, cert. denied, 248 Conn. 907, 731 A.2d 309 (1999).

General Statutes § 52-552e provides that a transfer is fraudulent "if the creditor's claim arose before the

transfer was made or the obligation was incurred" and the transferor made the transfer with an "intent to hinder, delay or defraud any creditor of the debtor . . . ." " 'Creditor' means a person who has a claim." General Statutes § 52-552b (4). " 'Claim' means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." General Statutes § 52-552b (3).

When reviewing the trial court's interpretation of a statute, our review is plenary. See *Lopiano* v. *Lopiano*, 247 Conn. 356, 363, 752 A.2d 1000 (1998). The legislature chose to adopt a very broad definition of the term "claim." Where the language of a statute is plain and unambiguous, it should be given full effect. *State* v. *Jones*, 51 Conn. App. 126, 137, 721 A.2d 903 (1998), cert. denied, 247 Conn. 958, 723 A.2d 814 (1999).

The trial court concluded that the plaintiff's " 'claim' arose on the day he was assaulted, even though his right to payment had not yet been reduced to judgment and was disputed." In light of the broad definition that the legislature gave to the term "claim," we conclude that the trial court properly determined that the plaintiff's claim arose on the date of the injury in the underlying action.

Whether the defendants transferred funds out of Pub, Inc.'s account with the "actual intent to hinder, delay or defraud" the plaintiff is a question of fact. *Picataggio* v. *Romeo*, supra, 36 Conn. App. 791. Section 52-552e (b) provides numerous factors for the trial court to consider when determining whether a fraudulent transfer occurred. See footnote 11.

The evidence presented overwhelmingly indicates that Quinn transferred funds out of Pub, Inc., to both himself and NNIUQ, Inc., after he was served with notice of the plaintiff's claim. At all times, Quinn

retained control of the funds. Quinn, even after having been notified of the default judgment against Pub, Inc., took a large salary for the first quarter of 1994. His only explanation was, "I am entitled to any and all profits." Furthermore, when Quinn was asked how he treated Pub, Inc.'s vendors, he responded, "I pay them all the same." Yet when asked, "And why isn't Mr. Davenport the same?" he responded, "The business went out of business." After all of the transfers of Pub, Inc.'s assets, the ending bank balance was only $363.63. The trial court's memorandum of decision notes each of those facts. The trial court had before it sufficient evidence to find that the plaintiff had met his burden of proving, by clear and convincing evidence, that Quinn and NNIUQ, Inc., had engaged in a fraudulent transfer as defined in § 52-552e.

The judgment is affirmed.

In this opinion the other judges concurred.