[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
What is a poor father and husband to do? He has five children from his first marriage and two by his present wife who contributed measurably to the raising of all seven. He also has a substantial business in which all the children have worked at one time or another — some are still actively involved. In addition, he owns several parcels of valuable real estate. Add to this mix — high stakes gambling, fast racing cars, domestic violence, an arrest, ongoing infidelity, a suicide of one child, questions of paternity of another, serious illness, and one has all the ingredients of a Shakespearean tragedy.
 PLEADINGS
To set the stage, the parties first met in 1968, were married on September 28, 1974, a total of 27 years, and separated in October of 2000. It was the second marriage for both, their first marriages having each ended in divorce. The original complaint in the instant action, filed by the Wife on February 7, 2000, claimed in prosaic fashion, a dissolution of marriage, an equitable distribution of the parties' property, alimony, counsel fees, and other relief. That was the last commonplace filing in this case.
Three amended complaints were filed, the last one dated September 24, 2001 had three counts. The first count labeled. (Dissolution of Marriage), was addressed to the Husband only and had identical claims as in the original complaint. The second count labeled (Fraudulent Conveyance — Intentional), was addressed to the following: the Husband; the five children from the first marriage (one child, George Jr. died during the pleading stages and the administratrix of his estate was ultimately substituted as a party); two "spray trusts" established for the two children of the second marriage; and the LDGG Limited partnership (title holder to various business properties). This second count claimed avoidance of transfers of certain property, inclusion of the property affected, or the value of same, in the marital estate, compensatory damages, attorney's fees, and other relief. The third count (labeled Fraudulent Conveyance) was addressed to the identical parties as in the second count and had identical claims for relief
On October 11, 2001, the Husband filed an answer and cross complaint admitting the allegations of the first count of the Wife's complaint, denying the allegations in the second and third counts, and by way of cross-complaint, claimed a dissolution of marriage and other relief. By way of answer, the Wife admitted the material allegations in the cross-complaint.
On October 30, 2001, the defendant children of the first marriage CT Page 475 denied the truth of the matters in the second and third counts of the first amended complaint. They also filed four special defenses as follows: the bar of the statute of limitations, laches, unclean hands, and that the alleged transfers were made for value. On November 8, 2001, the Wife's reply denied each and every special defense.
There were also four counterclaims filed by the five children of the first marriage, as well as a general demand for a jury trial. All four counterclaims, as well as the claim for a jury trial, were addressed in a memorandum of decision filed by State Trial Referee Robert Berdon dated May 14, 2001 and were not at issue in the instant case. In essence, former Supreme Court Justice Berdon ruled that "the issues of the dissolution of marriage, property and alimony and other claims together with the counts on fraudulent conveyance and the special defenses of the defendant children will be tried to the court. After the court decides these issues, and enters judgment, the court will address the issues relative to the defendant children's counterclaims." Thus, the jury trial on the counterclaims, if the litigants choose to pursue them, must await another day. On November 8, 2001, the Wife answered the counterclaims of the five children and filed special defenses to those allegations which, because of the Berdon ruling, are not before this court.
On October 30, 2001, the successor trustee of both the Jesse Greco Spray Trust and the Thomas Zickas Spray Trust (separate trusts established for the benefit of the two children of the Husband and Wife), filed an answer which, like the denials of the five children from the first marriage, denied the allegations of the second and third counts as addressed to them. The successor trustee also filed special defenses, basically denied by the Wife in her pleadings dated November 8, 2001, claiming that the transfers to the spray trust were not made with the intent to withdraw marital assets from the marital estate, were made as part of a comprehensive estate plan, and that the Wife had waived any rights she may have had to object to the creation of the trusts and is therefore estopped from objecting any further. Those claims are determined by this memorandum. It is significant to note that the two children of the Husband and Wife, Jesse Greco and Thomas Zickas, were not parties to the action brought by their mother against the Husband and the five children from the first marriage, even though the successor trustee of the trusts which were created for their benefit was a party. Also, Thomas testified on his mother's behalf and, apparently, in opposition to the position of the successor trustee of the trust allegedly created for his benefit. Further, according to testimony, Jesse still resides with his mother.
On November 27, 2001, the administratrix of the estate of George Greco Jr., (one of five children of the first marriage committed suicide during CT Page 476 the pleading stage), also filed an answer essentially denying the allegations of the second and third counts as addressed to her. It is significant to note that, after the first day of trial, counsel for the administratrix of the estate determined, with keen prescience, that protracted proceedings were inevitable, and that his participation was adequately protected by counsel for the remaining four children. He then advised the court that he would no longer be participating in the trial proceedings. True to his word, he was not seen again.
 CASE PERSPECTIVE
Sadly, what was born as a routine, uncontested dissolution of marriage, grew into a monster of internecine conflict. Throughout the proceedings, exceedingly competent lawyers represented the parties, and they presented their cases with clarity and exceptional zeal. Nonetheless, it remains a mystery to the court why such highly experienced, polished professionals were unable to avoid the monster which was created. Perhaps the litigants simply refused to listen to the advice of their seasoned counsel.
To put the case in perspective, one must consider the following:
• a complaint and three amended complaints were filed by the Wife;
• separate answers were filed by the Husband, four of the five children of the Husband's first marriage, the administratrix of the estate of a deceased child, and the trustee of two separate trusts;
• four special defenses were filed by the five children of the Husband's first marriage and one special defense was filed by the trustee;
• a cross-complaint was filed by the Husband;
• four counterclaims were filed by the five children from the Husband's first marriage;
• 86 pendente lite motions were filed;
• 192 separate pleadings appear in the court file;
• numerous lengthy legal memoranda were filed by the various parties on a variety of legal issues;
• during the pleading stage, the Husband was arrested by the Woodbridge Police Department for assaulting the Wife and disorderly CT Page 477 conduct;
• at the Husband's arraignment on the criminal charges, a protective order in favor of the Wife was issued by the New Haven Superior Court;
• numerous pendente lite hearings were held and 27 separate pendente lite orders issued;
• numerous depositions of different fact and expert witnesses were taken;
• during the pleading stage, one of the five children of the Husband's first marriage committed suicide necessitating the substitution of his estate as a party;
• Judge Barbara Coppeto, a very experienced family court jurist, unsuccessfully conducted a full day pretrial in an effort to settle the case;
• former Supreme Court Justice Robert Berdon, after hearing, issued a memorandum of decision severing the children's claim for a jury trial on their counterclaims (one can only surmise how long the trial would have taken had there been a jury to hear part of the claims);
• Judge Lynda Munro, also a very experienced family court jurist, unsuccessfully conducted two full days of pretrial in a further effort to settle the case;
• a total of 123 exhibits were filed — plaintiff filed 74; defendant filed 40; and the five children of the first marriage filed nine;
• eight lawyers participated in the trial, three for the Wife, two for the Husband, one for four of the five children from the Husband's first marriage, one for the two trusts established for the benefit of the two children of the parties, and one for the administratrix of the estate of the deceased child, issue of the first marriage;
• six experts testified;
• six fact witnesses testified;
• the trial was conducted over 13 days;
• total fees for experts retained by the parties were as follows; CT Page 478
 Wife $58,882.30 Husband 1,295.00 Children 26,172.50
Total $86,349.80
• total legal fees and costs incurred by the parties through December 7, 2001 (does not include the last day of trial), a substantial portion of which remains unpaid, were as follows:
Day, Berry, and Howard LLP (Attorneys Ernest J. Mattei and Michael P. Shea for the Wife) $401,657.51
Tyler, Cooper, and Alcorn LLP (Attorneys James R. Greenfield and Kelly P. Lutz for the Husband) 119,300.32
William H. Clendenen, Jr. (Attorney for four of the five children from the first marriage) 156,593.75
Dinan Dinan (Attorney Althea S. Dinan for the Wife) 45,592.04
Ullman, Perlmutter Sklaver (Attorney Irving H. Perlmutter for the successor trustee) 34,867.65
Sinoway McEnery, P.C. (Attorney Gerard McEnery for the estate of the deceased child of the first marriage) 8,150.00
John Mager (Wife's first attorney) _____7,500.00
TOTAL $773,661.27
• total legal fees and expert fees combined amounted to $860,011.07 (does not include the last day of trial).
• total assets involved in the litigation amounted to $1,753,245.21.
 HUSBAND AND WIFE
The protagonists in this tragedy include the Wife, who is 54 years of age, a 1968 graduate of Southern Connecticut State University, a woman with few skills who was employed only briefly during her life, and was essentially a homemaker throughout the marriage. Her health is not good. CT Page 479 She suffers from osteoarthritis, fibromyalgia, and irritable bowel syndrome. She described being in almost constant pain, under the care of different physicians, and in need of daily medication.
Up until the parties separated, the Wife had available to her the Husband's net weekly pay check of $666.00 which was deposited into the joint checking account, weekly cash of up to $350.00 brought home by the Husband which was used for incidentals, and about $2,800.00 in monthly ($650.00 weekly) rental checks from the commercial real estate owned by the Husband which was saved in a money market account. As a homemaker, caring for a large residence and at one time seven children, she did not contribute by way of employment income. It would appear that she has little ability to acquire assets or produce income in the future. Despite testimony about some income from her porcelain doll hobby or business, noincome capacity is assigned to the Wife at this time.
In light of these findings, the court must be mindful of the holding inO'Neill v. O'Neill, 13 Conn. App. 300, (1988) in which the Appellate Court said "that a determination of each spouse's `contribution' within the meaning of General Statutes 46b-81 includes non-monetary as well as monetary contributions." In articulating its rationale, the court stated: "A property division ought to accord value to those nonmonetary contributions of one spouse which enable the other spouse to devote substantial effort to paid employment which, in turn, enables the family to acquire tangible marital assets. The investment of human capital in homemaking has worth and should be evaluated in a property division incident to a dissolution of marriage. We hold, accordingly, that an equitable distribution of property should take into consideration the plaintiff's contributions to the marriage, including homemaking activities and primary care-taking responsibilities."
The other protagonist, the Husband, is 64 years of age, completed the eighth grade, (testimony indicates he has difficulty reading and writing although that was not evident to the court) and has been engaged in the auto repair and parts business throughout his life. His health is very poor. He suffers from angina and other related health problems which commenced in 1988. After numerous surgical procedures, he remains under the care of various physicians, takes nine different medications, and is depressed. It would appear that his ability to work has been seriously compromised.
Nevertheless, he does have a $73,840.00 annual income from the auto parts business which he transferred out of his name, receives regular cash gifts of up to $500 from at least one of his children, and manages to continue an active gambling pastime on at least a twice weekly basis. In the last three years, IRS tax returns (see Plaintiff's Exhibits #59, #60 CT Page 480 and #74) indicate gambling winnings as follows: 1998 winnings $13,300.00; 1999 winnings $33,580.00; and 2000 winnings $72,700.00. On one particular day he won $18,000.00 (Interestingly, testimony indicated that the defendant daughter Tina allegedly won $250,000.00 on a particular day). The court is fully aware that he offsets losses against the winnings as shown on his tax returns but that fact does not obviate the extent of his gambling activity.
The Husband testified that, as president of the auto parts company which bears his name, he works only two to three hours per day, three or four days per week. Nevertheless, his efforts warranted a $10,000.00 per year raise for 2001. It should be noted that while he only owns 65 shares (.005%) of Greco Auto Parts, Inc. out of 12,190 shares outstanding, he maintains 53.3% of the voting shares (65 out of 122). As a result, even though he transferred 99.5% of the outstanding shares to his children, he retains control of the corporation by virtue of his majority ownership of the voting shares.
In addition to his salary, he receives full medical benefits and the use of a 1995 Lincoln automobile with all expenses paid. He did have a credit card which, since his deposition last July, he no longer uses. Socially, he and his current girl friend, with whom he admitted he was intimate, enjoy complimentary dinners and shows at the Mohegan Casino, awarded to him because of his gambling activity. As a frequent gambler at the Mohegan Sun Casino, he also accumulates points which he uses to obtain clothing, television sets, and other merchandise.
His expectation is that his children will take care of him when he ultimately retires, presumably because of the transfers to them of the auto parts business and the related income producing commercial property. He actually testified that he expected his children to take care of him and his Wife. It is not hard to believe that the children will not be taking care of her.
 CHILDREN
Seven adult children are also major players in this tragedy. Five of the children were from the Husband's first marriage. They are Linda Greco, who currently works full time at Greco Auto Parts, worked there throughout her life, and is relied upon heavily by her father; George Greco, Jr., who committed suicide last May, was actively involved in the family business throughout his life and, until his death, appeared to be the heir apparent; Dominic Greco, who continues to be actively involved in the business as he has been throughout his life; Roseanne Acker, a married daughter who formerly was actively involved in the company but currently operates a related radiator business which was spun off from CT Page 481 the main business some years ago; and Tina Greco, the youngest, who works in the business but has not been as actively involved in management as her siblings. "Linda, George, and Dominic were the heart of the business — they ran it" stated the Husband.
The Wife testified that at the time of the Husband's first divorce, in which he was awarded custody, his five children were not in very good condition. She said they had all been obviously neglected, had lice, poor hygiene, and serious discipline problems. Just prior to her marriage to the Husband, from March 1974 to September 1974, the Wife lived with and took care of the Husband's five children, as well as one of her own, with some assistance from his mother, while the Husband continued to work long hours in his auto business. They did not even live together at that time. He lived near his business in West Haven and she lived in a house which he purchased for her in Woodbridge. She managed the household, which included keeping books, paying bills, preparing meals, acting as disciplinarian, providing healthcare, monitoring schoolwork, helping with extracurricular activities, organizing birthday parties, preparing for holidays, and handling emergencies. This pattern of caring for the children continued after the marriage and included providing emotional support for the Husband who finally moved in with the Wife and his children. Two years after the marriage, a seventh child was added to the household further contributing to what was described as a "chaotic" environment.
Two of the seven children discussed in this case were born to the Wife. The child, Thomas Zickas, was actually born during the Wife's first marriage and bears the first husband's surname. Her then husband always considered the child to be his own, acknowledged same during their divorce proceedings, and faithfully paid for his support throughout the child's minority. In reality, Thomas, as DNA testing in 1997 ultimately proved, was the child of her current Husband George Greco. While still mated to Zickas, it seemed that the Wife was in an adulterous relationship with Greco which produced the child Thomas who was unknowingly raised by Zickas. Since his birth, the question of Thomas' paternity was a frequent argument and source of friction between the parties. Sadly, the other five children never accepted him as the blood brother he really was.
Thomas, now 33 years old, worked in the family business throughout his life until October 2000 when, after an altercation with his half brother George Greco Jr. (now deceased), he was fired. Apparently, underlying the firing, was a long simmering rivalry between George Jr. and Thomas over who would drive the prestigious company racing car (as part of the company's business, the car was raced all over the country, at first by the Husband and then by George Jr. and Thomas). The father ultimately CT Page 482 settled the issue by selecting George Jr. in a decision that troubles him to this day and contributed to the ultimate breakdown of the marriage. Furthermore, it would appear that Thomas was treated disproportionately by the father in his "estate planning" which favored Linda, George, and Dominic, a fact that became another major contributor to the breakdown of the marriage.
Jesse, now 25 years old, is the seventh child, born in 1976 during the current marriage. Unfortunately, at age 10, Jesse was in a very bad bicycle accident from which he suffered a traumatic brain injury. He was hospitalized for many months at the Newington Children's Hospital. For a long time thereafter he experienced memory and emotional problems which affected his school work. After much attention, he graduated from a technical school and is now doing well. He has little contact with the family business and apparently no interest in same. Like his brother Thomas, he was treated disproportionately by the father in his "estate planning" which favored Linda, George and Dominic.
 ASSETS
The end toward which this drama is moving concerns the distribution of the assets owned by the parties. At the time of the marriage, the Wife had $4,600.00 received in her divorce settlement from her first Husband and no liabilities. She also had an old car and miscellaneous household items with no value ascribed. In 1998, her father passed away and she inherited approximately $186,000.00, most of which, incredibly, has been consumed in legal fees and other litigation expenses connected with this action. Some of it was put into the residence and the remainder is in the stock investments shown on her financial affidavit.
Both parties testified that the Husband had more liabilities than assets at the time of the marriage but no details were pointed out to the court. A review of his financial affidavit dated February 7, 1974, filed at the time of his first divorce (see Plaintiff's Exhibit #2), indicated he had assets of $36,900.00 and liabilities of $55,600.00. However, the Husband did have a pending negligence action as a result of serious injuries suffered when a backhoe ran over him in 1969 before he married his present Wife. He testified he ultimately received $125,000.00 from the settlement in 1976, shortly after the marriage to his Wife, which he put into his auto parts business. In addition, it is clear that he owned the residence at 24 Sunbrook Road in Woodbridge to which, after numerous arguments over the subject, he added his Wife's name.
There was also testimony from both parties about a prenuptial agreement that was never introduced into evidence, prepared by the Husband's lawyer, protecting the Husband's five children, and signed by the Wife at CT Page 483 his insistence just two days before the marriage. She testified that he told her that he destroyed the document on their 10th anniversary because she was "a good wife." He said it just disappeared.
Total assets of the parties (J means asset is in joint names, H means asset is in the Husband's name, and W means asset is in the Wife's name) the court finds to be as follows:
ASSET FAIR MARKET VALUE Residence, 24 Sunbrook Road J $392,500.00 1998 Mitsubishi W $17,000.00 First Union Savings W $400.00 First Union Checking W $200.00 First Union Business Checking W $180.00 Morgan Stanley Brokerage J $7,000.00 Smith Barney Mutual Funds W $37,900.00 Smith Barney IRA W $5,856.56 IRA H $9,900.00 Tractor and Miscellaneous tools H $5,000.00 Citizens Checking H $2,257.00 H. Quotient 1585 shares H $459.65 H. Quotient 11,094 shares H $3,217.00 65 share of Greco Auto Parts, Inc. H $250,000.00 1991 Ford Mustang W 0 Life Insurance W 0 Life Insurance H 0 Regency Group Brokerage J 0 Household Furnishings W 0 Household Furnishings H _______0___ TOTAL ASSETS $731,870.21
Liabilities of both parties were essentially for counsel fees and expenses of this litigation.
 FRAUDULENT CONVEYANCE
It is the Wife's stated position that the Husband's transfer of stock in Greco Auto Parts, Inc. to the five children of his first marriage, the transfer of title to various real estate parcels to the LDGG Limited Partnership, and the transfer of assets to the "spray trusts" were fraudulent, should be set aside by the court, and the assets returned to the marital estate. During the trial, it became clear to the court that the Husband had dual motives in transferring his assets as he did. The first was to preserve said assets for his seven children in varying degrees and secondly to deprive his Wife of any share in same. CT Page 484
Transfers such as those alleged in the present case, are controlled by the Uniform Fraudulent Transfer Act (UFTA), General Statutes Sec. 52-552a
to 552l, and by a substantial body of case law. A fraudulent conveyance cause of action may be joined in a dissolution action and the transferee of the alleged fraudulent conveyance may be joined as a party in that action. Gaudio v. Gaudio, 23 Conn. App. 287, 294 (1990).
"If a fraudulent transfer claim is joined with a marriage dissolution action, as in the present case, the issue is whether the transfer removed property from the marital estate that would otherwise have been subject to claims of equitable distribution." Dietter v. Dieter, 54 Conn. App. 481,495 (1999).
"A party who seeks to set aside a conveyance as fraudulent bears the burden of proving that the conveyance was made without substantial consideration and then, as a result, the transferor was unable to meet his obligations (constructive fraud) or that the conveyance was made with fraudulent intent in which the transferee participated (actual fraud)."Crepeau v. Gronager, 41 Conn. App. 302, 309 (1996).
"[T]he determination of the question of fraudulent intent is clearly an issue of fact which must often be inferred from surrounding circumstances. . . . Such a fact is, then, not ordinarily proven by direct evidence, but rather, by inference from other facts proven — the indicia or badges of fraud." Dieter v. Dietter, supra,54 Conn. App. 487 (1999).
"Section 52-552e (b) provides numerous factors for the trial court to consider when determining whether a fraudulent transfer occurred."Davenport v. Quinn, 53 Conn. App. 282, 304, 730 A.2d 1184 (1999). These factors, also known as indicia or badges of fraud, include: "(1) The transfer or obligation was to an insider, (2) the debtor retained possession or control of the property transferred after the transfer, (3) the transfer or obligation was disclosed or concealed, (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit, (5) the transfer was of substantially all the debtors' assets, (6) the debtor absconded, (7) the debtor removed or concealed assets, (8) the value of the consideration received by the debtor was-reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred, (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred, (10) the transfer occurred shortly before or shortly after a substantial debt was incurred, and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." General Statutes § 52-552e (b). CT Page 485
In the present case, the plaintiff alleges that the beneficiaries of the transfers made by the defendant were his children, who are "insiders" under the provision of § 52-552e (b)(1). "`Insider' includes . . . if the debtor is an individual . . . a relative of the debtor or of a general partner of the debtor. . . ." General Statutes § 52-552b
(7).
"In considering factors listed in [§ 52-552e (b)] a Court should evaluate all the relevant circumstances involving a challenged transfer or obligation. Thus the court may appropriately take into account all indicia negativing as well as those suggesting fraud. . . ." UTTA § 4, comment 6.
In the instant case, unfortunately for the Wife, the standard of proof required by our law to set aside a transfer as fraudulent is "clear and convincing evidence, clear and satisfactory evidence or clear, convincing and unequivocal evidence." Murphy v. Wakelee, 247 Conn. 396, 400 (1998);Farrell v. Farrell, 36 Conn. App. 305, 309 (1994). Such a burden is much heavier than the more common civil standard, a fair preponderance of the evidence. It is not too hard to see that the Wife has not satisfied that heavy burden.
While the court is quite sympathetic to many, but not all, of the Wife's assertions, the Husband also makes persuasive arguments supporting his reasons for the transfer. They include the following:
• a belief that his Wife would inherit a substantial amount of money from her father (since realized to be approximately $186,000.00);
• an intention to transfer to the Wife his interest in the marital residence which had substantial equity;
• he maintained a $198,500.00 life insurance policy on his life for the Wife's benefit which, in the event of his death, would provide substantial funds for her care and maintenance;
• from the time they were very young, he had often promised his children that the business and its related property would be theirs;
• the children, to varying degrees worked in the business, often very long hours for less than fair market wages, in anticipation of ultimately having ownership of the business and its related property;
• long before the dissolution of marriage was commenced, he discussed with his Wife his intention to transfer the business and the accompanying property to the children (her response was that it was all CT Page 486 right with her as long as it was equal between all seven children — a view he did not share and often produced arguments);
• he felt it was not appropriate to leave the business to the children equally because some had worked longer in the business than others (the child Jesse only worked in the business for a matter of weeks and expressed no interest in same);
• the child Roseanne Acker should not get a full share as the radiator business had been spun off to her earlier;
• the children of the first marriage, simply by virtue of their age, worked longer in the business than did the children of the second marriage and were entitled to a larger share;
• a pre-nuptial agreement was discussed and signed before the marriage allegedly protecting the children of the first marriage;
• he feared, based upon the stormy relationship the Wife had with the five children from his first marriage, that she would not treat them properly in the event of his demise.
While the Wife might have prevailed if a lesser standard of proof was used, the evidence she introduced was less than needed, not clear, convincing or unequivocal, for the proof of fraudulent transfer. Nevertheless, the evidence is clear that the Husband used marital assets to assist his children without consulting the Wife. Burns v. Burns,41 Conn. App. 716, (1996). Therefore, the assets involved in the transfers are not included in the marital assets for distribution by the court. However, the Husband's actions in removing said assets from the marital estate have been fully considered by the court in the orders fashioned herein. "The power to act equitably is the keystone to the court's ability to fashion relief in the infinite variety of circumstances which arise out of the dissolution of marriage."Pasguariello v. Pasquariello, 168 Conn. 579, 585 (1975).
In order to have a clear record for the parties, the court will make findings of the fair market value of both the business and the business real estate. Both parties presented credible expert witnesses on the fair market value of the business known as Greco Auto Parts, Inc. Business evaluation, as conceded by the experts, is an imprecise science. After listening to all the witnesses, including the experts, and examining numerous exhibits, the court finds the fair market value of said business to be $556,125.00 (includes the $250,000.00 value which the court ascribed to the Husband's 53.3% interest in the voting shares). CT Page 487
Regarding the property transferred to the LDGG Limited Partnership, both parties introduced into evidence written appraisals for the court's consideration. After examining said appraisals, the court finds the fair market value of all of the business parcels to be $715,250.00.
 CAUSES OF BREAKDOWN
In all tragedies, the plot is important to understand. What brought these parties to this juncture-to this failure of their marriage? In this case, the causes of the marital breakdown were many and were made manifest throughout the course of trial. High on the list, from the court's vantage point, was lack of communication. Clearly, had the parties confided or talked to one another this chaotic conclusion to their relationship might have been avoided. To chronicle the multiple causes for the breakdown, which is clearly irretrievable, would serve no useful purpose.
Not lost to the court's attention, was the fact that the parties entered the marriage. after having carried on a long, adulterous affair while still mated to their respective spouses at the time. That six-year premarital relationship produced the child named Thomas. The Wife's first husband, as well as this court in her subsequent divorce action, was deceived into believing he was the father. This deception, and the Husband's full and active participation in it, was an open sore in the marriage, often revisited by the parties.
Regarding specific claims, the Wife testified quite credibly, that the marriage broke down because of the Husband's excessive gambling in Connecticut, Las Vegas, and Atlantic City, repeated incidents of physical abuse, numerous threats, demeaning comments about her person and abilities, recurrent arguments over the children, preoccupation with his racing car hobby, and his continuing affaire with another woman. Her credible testimony was laced with numerous examples.
The Husband claimed, with some justification, that the Wife had numerous problems with his first five children, which produced many arguments, as did frequent discussion over his estate planning. He gave numerous examples of the friction which existed between her and the children. Other than the discord involving the children, he generally conceded that his Wife, with whom he had an intimate relationship for 33 years (five years longer than the length of the marriage), took care of the home, cooked meals, did the laundry, paid the bills, managed household finances, took care of the parties' two children, took care of the Husband's five children from his first marriage, handled all medical issues for the children, helped all the children with their schoolwork, and was a good wife. He told the court that he was happy with his Wife CT Page 488 and did not want a divorce. Suffice it to say, he had unusual ways of demonstrating his happiness.
And now, for the final act, it is the court's duty to fashion fair and equitable! relief for the pates. In so doing, the court is. mindful of the anger, bitterness, madness, and sadness which filled the courtroom for 13 days, and has little hope that the resolution proffered will please any of the litigants. So be it-an end there must be.
The court finds that residence requirements have been satisfied and neither party has been the recipient of public assistance. All pertinent criteria outlined in Chapter 815j of the General Statutes were carefully considered by the court in the entry of the following orders.
 ORDERS
DISSOLUTION OF MARRIAGE
The marriage is dissolved on the grounds of an irretrievable breakdown.
ALIMONY
The Husband shall pay to the Wife alimony of $710.00 per week until the death of either party, the Wife's remarriage or her cohabitation, pursuant to an immediate wage withholding order. Until the payments are effectively withheld from his wages, payments are to be made directly to the Wife.
LIFE INSURANCE
The Husband shall immediately transfer to the Wife his ownership interest in the $198,500.00 United Life Insurance Company policy. He shall be solely responsible for the prompt payment of the premiums on said policy which are not to be considered alimony. This paragraph is subject to modification.
In addition, the Husband shall name the Wife beneficiary on any group life insurance he might have available to him through employment, and on any other life insurance which might be available to him such as through credit cards. Upon reasonable request, he shall furnish the Wife, under oath, with satisfactory evidence that such insurance is being properly maintained, or that he has no such insurance.
MEDICAL INSURANCE
The Husband, at his sole cost, shall continue to maintain the medical CT Page 489 insurance he now has in force covering the Wife for a period of three years from date. The Husband may avail himself of COBRA benefits, claimed to be $497.68 per month, for this purpose. Said payments are not to be considered alimony. This paragraph is subject to modification.
REAL ESTATE
The Husband shall immediately quit-claim to the Wife his interest in the marital residence located at 24 Sunbrook Road, Woodbridge subject to all real estate taxes and other liabilities concerning said property which shall remain her sole responsibility.
GRECO AUTO PARTS, INC.
The Husband shall, within 90 days from date, transfer to the Wife his total interest in Greco Auto Parts, Inc., represented to be 65 shares. At his option, in lieu of transfer of the shares, he may pay to the Wife the lump sum of $250,000.00 in cash within said 90 days. At his further option within said 90 days, in lieu of transfer of the shares or payment of the lump sum of $250,000.00 cash, he may deliver to the Wife his promissory note in the amount of $250,000.00, providing for interest of seven percent per annum, payable monthly over a ten-year period, with adequate security.
Until the transfer is complete, or one of the options fully exercised, the Husband shall not vote for any changes in the corporate structure as previously ordered during the trial. The court shall retain jurisdiction to resolve any disputes such as adequacy of the security or appropriateness of the documentation, to safeguard the interests of the parties, and to protect the interests of the corporation until these orders are fully implemented.
PERSONAL PROPERTY
The Wife shall retain all of the furniture, household possessions, and other personal property now located in the marital residence, with the exception of certain items hereinafter described which shall remain the Husband's sole property. He shall have 30 days from date to remove said items, in the company of a police officer, or consider them abandoned. In addition to the furniture, household possessions, and other personal property in his possession and control, the Husband shall retain the following:
1. 1991 Ford Mustang;
2. Air compressor; CT Page 490
3. Portable hydraulic lift;
4. Two post car lift;
5. Steel bench and vise;
6. Two grinding wheels;
7. Phase converter;
8. Hand-made clock;
9. Gun cabinet and miscellaneous contents;
10. Wooden duck collection (approximately 15);
11. Model airplane collection;
12. Two metal cabinets and miscellaneous tools;
13. Tool box and hand tools;
14. Bow and arrow rack and bow and arrows;
15. Steel welding bench;
16. Electric drill;
17. Skill saw;
18. Two mounted fish;
19. Sewing room television set;
20. Bose surround system;
21. Treadmill;
22. Exercise bike;
23. VCR tapes (personal);
24. Fishing rods, reels, tackle box and boots;
25. Trophies; CT Page 491
26. Personal pictures, papers, birth certificates, books and manuals;
27. Winter jackets and all other clothing;
28. All Quotient stock;
29. Citizens checking account;
30. Regency Group brokerage account.
The Wife shall retain the following:
1. 1998 Mitsubishi;
2. First Union Savings;
3. First Union Checking;
4. First Union Business Checking;
5. Morgan Stanley Brokerage (Joint Account);
6. Smith Barney Mutual Funds.
RETIREMENT ASSETS
The Wife shall retain her Smith Barney IRA represented to be $5,856.50. The Husband shall transfer to the Wife by rollover his IRA represented to be approximately $9,900.00.
LIABILITIES
Each party shall be solely responsible for the liabilities shown on their respective financial affidavits.
COUNSEL FEES
The Husband shall pay to the Wife counsel fees in the amount of $100,000.00, at the rate of $20,000.00 per year, commencing one year from date.
TAXES
By April 15 of each year, until there is no longer any obligation for alimony, the parties shall exchange their complete IRS returns in order CT Page 492 to determine that the payments are appropriate under the circumstances then existing.
MISCELLANEOUS
Each party shall sign any necessary documents to effectuate the orders contained herein.
Plaintiff's counsel shall prepare the judgment file, have it certified by all counsel of record, and file it with the court within 60 days.
CUTSUMPAS, J.